Deborah SWEENEY,
Plaintiff–Appellant–Cross–Appellee,

John C. Butters and James F. Ponsoldt,
Movants–Appellees–Cross–Appellants,

Fortson & White,
Movant–Appellee–Cross–Appellant,

Mary M. Brockington,
Movant–Appellee–Cross–Appellant,

v.

ATHENS REGIONAL MEDICAL
CENTER, etc., et al.,
Defendants.

No. 89–8738.

United States Court of Appeals,
Eleventh Circuit.

Nov. 30, 1990.

See also, 709 F.Supp. 1563, 705 F.Supp. 1556.

L. Ray Patterson, Athens, Ga., for Sweeney.

Harvey S. Gray, Atlanta, Ga., for Fortson and White.

Jeffrey M. Smith, Arnall, Golden & Gregory, Atlanta, Ga., for Brockington.

John C. Butters, Atlanta, Ga., pro se.

James F. Ponsoldt, Athens, Ga., pro se.

Before FAY and JOHNSON, Circuit Judges, and ALLGOOD *, Senior District Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from the district court's allocation of a settlement fund among Deborah Sweeney, the plaintiff in the underlying action; Mary M. Brockington, John C. Butters, and James F. Pon-

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

soldt, individual attorneys for Sweeney in the underlying action; and Fortson & White of Atlanta (F & W), the law firm which represented Sweeney at the inception of the underlying case. The district court based the allocation on its interpretation and reformation of a contingency fee contract between Sweeney, Butters, and F & W. We now affirm in part and reverse in part, remanding for proceedings consistent with this opinion.

## I. STATEMENT OF THE CASE

### A. *Factual Background*

Deborah Sweeney was a certified nurse mid-wife in Athens, Georgia, and an instructor at a local medical college. In the fall of 1986, Sweeney hired F & W to represent her in a lawsuit against the Athens Regional Medical Center, Athens Obstetrics and Gynecology, P.C., Athens Women's Clinic, and ten doctors. Sweeney's complaint alleged slander, conspiracy in restraint of trade and refusal to deal in violation of the Sherman Anti–Trust Act, violations of her First Amendment right of freedom of speech, violations of Georgia antitrust law, violations of Georgia's Uniform Deceptive Business Trade Practices Act and Fair Business Practices Act, tortious interference with contractual and business relationships, and intentional infliction of emotional distress. Under her initial agreement with F & W, Sweeney was to pay F & W a reduced hourly rate in addition to a contingency fee of 20%. Sweeney financed the suit primarily through a fundraising campaign.[1] The case was assigned to Jack Hinton, a partner at F & W. Mary Brockington, a new associate with the firm, performed the majority of work on the case.

In 1987, Sweeney became concerned about the antitrust aspect of the suit. She contacted Susan Jenkins, an attorney in Washington, D.C., who specialized in medical antitrust. Jenkins consulted with Brockington, who then sent Jenkins the pleadings and various other information on the case. In Jenkins' view, the antitrust claims were not receiving the attention they merited. She made suggestions and drafted memos mapping out a plan for the case. She submitted a bill to F & W for this work. After meetings early in 1988, Hinton and Sweeney decided it would be necessary to involve an antitrust expert more intimately in the case and to refashion the contingency fee agreement.[2] When Jenkins refused to become involved on a contingency fee basis, Hinton invited John Butters, an antitrust lawyer in Atlanta, to associate on the case. Sweeney, Butters, and F & W entered a new fee agreement on April 22, 1988. Sweeney agreed to guarantee Butters a sum of $20,000, part of which he would use to pay James Ponsoldt, a professor of law at the University of Georgia, as a consultant. Sweeney also agreed to reimburse the attorneys for all expenses as they came due.[3] She also agreed to give F & W and Butters 50% of all monies recovered in the suit. Finally, she agreed that any attorneys' fees that the court might award would go directly to the attorneys in addition to the 50% contingency fee. Butters and F & W were to divide the earnings on a pro rata basis according to the number of hours spent on the case.

Hinton left F & W in October of 1988. He agreed, however, to continue to represent Sweeney and to act as lead counsel if the case went to trial.[4] Hinton and F & W entered their own agreement regarding allocation between them of fees recovered

---

1. She raised approximately $47,258 after fundraising expenses.

2. Sweeney had by this point amassed approximately $50,000 in fees and expenses and was unable to keep up with payments.

3. F & W applied all monies Sweeney had previously paid under the original fee arrangement toward expenses.

4. In F & W's view Hinton remained active in the case. In several of the other parties' views, however, he did nothing on the case after he left F & W. At any rate, he is not a party to this appeal.

under the April 22nd fee arrangement with Sweeney. Brockington left F & W in December of 1988. At Sweeney's request, and with F & W's blessing, Brockington took the Sweeney case files with her. At that point, F & W obtained a letter from Sweeney stating that F & W was no longer responsible for the case. The letter also stated that Sweeney would thereafter be represented by Hinton, Brockington, Butters, and Ponsoldt. On March 14, 1989, Brockington agreed via letter to F & W that she would share with F & W in its 50% contingency fee under the April 22nd fee agreement on a pro rata hourly basis. The Brockington letter was copied to Sweeney and Butters.

Later in the spring of 1989, as the suit was reaching settlement with the ten doctors, Butters and Ponsoldt informed Sweeney and the other attorneys participating in the case that they no longer considered the April 22nd agreement to be valid. They made various proposals for restructuring the fee arrangement, all of which would increase their share of the impending settlement. Butters allegedly even told Sweeney that he would withdraw from the suit if she did not agree to a new fee contract. Sweeney thereafter retained yet another attorney to represent her in the fee dispute. When the suit settled on May 22, 1989, the parties were still fighting over the fee allocation. The parties deposited the settlement checks in an interest-bearing account under the names of Sweeney, her husband, Butters, Ponsoldt, and Brockington.

### B. *Proceedings Before the District Court*

Sweeney discharged Butters and Ponsoldt in June of 1989 and through her new attorney filed a motion for allocation of fees and partial forfeiture of attorneys' fees for breach of fiduciary duty in the district court. Butters filed a motion to enforce the April 22nd fee agreement. F & W also filed for allocation of fees.

After a hearing on August 10, 1989, the district court entered an order enforcing the April 22nd fee agreement as reformed

to reflect the intent of the parties. The court held that under the agreement Sweeney was due 50% of the settlement fund. Sweeney was, however, obligated to pay the costs of the litigation, including monies still owed to F & W and Jenkins' fee. The other 50% of the settlement fund was to go to the attorneys in accordance with the April 22nd agreement, as reformed to take into account Brockington's March 14, 1989 letter, on the basis of hours expended. The hours were not weighted by varying hourly rates because nothing in the agreement mentioned weighting. All hours were thus of equal value. Because Ponsoldt was not party to the agreement, his hours were thrown in with Butters'; Butters was to pay Ponsoldt according to whatever agreement the two had reached separately. The hours Brockington spent after leaving F & W were thrown in with F & W's total (presumably F & W's total also included Hinton's hours) because Brockington was not a party to the agreement. The court then ordered F & W to pay Brockington in accordance with the March 14, 1989 letter.

The court also denied Sweeney's motion to order Butters, Ponsoldt, and F & W to forfeit attorneys' fees because of a breach of fiduciary duty. While the court noted "inconsistencies in the attorneys' words and actions," it stated that it would "give the attorneys the benefit of any doubt."

## II. ANALYSIS

At the outset we note that interpretation of an attorney-client fee contract is a question of law subject to *de novo* review on appeal. *Zaklama v. Mount Sinai Medical Center*, 906 F.2d 650, 652 (11th Cir. 1990). This appeal requires us to address the district court's determination in three primary respects: (1) whether the district court was correct in choosing to enforce the April 22nd fee contract, (2) whether the district court was correct in its reformation of the contract, and (3) whether the district court was correct in its application of that contract in the actual disbursement of funds. As a concomitant issue we must also consider the district court's denial of Sweeney's motion for forfeiture of attor-

neys' fees because of the attorneys' breach of fiduciary duty. We must, however, as preliminary matters, address Ponsoldt's argument regarding our jurisdiction and Ponsoldt's and Butters' complaint that the district court erred in refusing to grant a request for notice, discovery, and an evidentiary hearing.[5]

### A. Ancillary Jurisdiction

Ponsoldt contends that the district court did not have jurisdiction to resolve F & W's motion for allocation of funds. Ponsoldt admits that the court had jurisdiction to entertain Sweeney's motions as ancillary to the underlying dispute because the district court has inherent authority to ensure that an attorney does not unethically extort fees from the client. *See Cooper v. Singer*, 719 F.2d 1496, 1504–05 (10th Cir.1983), *overruled in part on other grounds*, — U.S. ——, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990); *see also Broughten v. Voss*, 634 F.2d 880, 882 (5th Cir.1981) (stating "there is a long tradition of sustaining jurisdiction to determine fees due to an attorney dismissed by a client in a pending action"). Ponsoldt asserts, however, that the court's jurisdiction should be limited to resolution of

Sweeney's motion because F & W can be considered nothing more than a permissive intervenor in the suit. Under our precedent, ancillary jurisdiction cannot support the presence of permissive intervenors. *Warren G. Kleban Eng'g Corp. v. Caldwell*, 490 F.2d 800, 802 (5th Cir.1974).

■ Ancillary jurisdiction allows the court to hear claims that bear a " 'logical relationship to the aggregate core of operative facts which constitutes the main claim over which the court has an independent basis of federal jurisdiction.' " *Id.* (quoting *Revere Copper & Brass, Inc. v. Aetna Casualty & Sur. Co.*, 426 F.2d 709, 714 (5th Cir.1970)). Such a nexus would allow claims of intervenors of right, but not those of permissive intervenors to be heard by the court. *Id.* Under Fed.R.Civ.P. 24(a) an intervenor of right is one who claims an interest in the disputed property or transaction when the dispute puts at risk the intervenor's ability to protect that interest.

■ In the instant case, Sweeney's motion to allocate the settlement funds and to order partial forfeiture of the attorneys' fees required the court to construe the April 22, 1988 fee agreement to which F &

---

**5.** At the outset we should also note that the record of the district court proceedings in this case is under seal. The reason for the district court's order sealing the record was that the parties to the settlement agreement wished for its terms to remain confidential. By order of this Court, the briefs on appeal were sealed upon motion of the parties. The parties also jointly moved that oral argument in this appeal be sealed. That motion, however, was not granted. These seals put us in a peculiar position in writing this opinion. Punctilious adherence to our own order sealing the briefs would allow us to do nothing but mutely nod and point, as we could not even discuss the arguments counsel put forth in their briefs on topics wholly unrelated to the settlement agreement. These arguments were, however, also presented in open court before us at oral argument. Moreover, the attorneys themselves who requested the seal of the briefs stated in open court at oral argument certain terms of the settlement, *including its amount*. Under our precedent, "[t]here is no question that a common law right of access exists as to civil proceedings." *Wilson v. American Motors Corp.*, 759 F.2d 1568, 1570 (11th Cir.1985). "What transpires in the courtroom is public property." *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249,

1254, 91 L.Ed. 1546 (1947). It seems clear that even the media would be "free to report whatever occur[red] in open court" before us at oral argument. *United States v. Gurney*, 558 F.2d 1202, 1208 (5th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). That being the case, we do not feel constrained in discussing in full the arguments there presented, whether fully debated or merely briefly touched upon. We have, moreover, entered an order unsealing the briefs in order to facilitate our discussion of the issues in this case. We have endeavored, however, not to mention the settlement's terms even though the parties themselves revealed them at oral argument because such a revelation is not necessary to our discussion or our instructions to the district court. We note, however, that under *Wilson, supra,* it is not likely that a blanket seal on the district court proceedings would withstand a challenge by a third party seeking access. *Wilson,* 759 F.2d at 1571 (stating that "litigants do not have the right to agree to seal what were public records. The district court must keep in mind the rights of a third party—the public, 'if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system.' " (quoting *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir.1983)).

W was a party. No other party in the dispute had cause to represent and protect F & W's interest in that agreement. *See* Fed.R.Civ.P. 24(a)(2). Consequently, F & W is an intervenor of right whose presence ancillary jurisdiction can support.[6]

Ponsoldt also argued that the court did not have jurisdiction because the underlying dispute between Sweeney and the defendants had terminated on May 22, 1989, with the settlement agreement. Ponsoldt is incorrect on this point. Though Sweeney settled with the doctors in May, the claims were not officially dismissed until August 18, 1989, the same date as that of the court's order allocating the settlement funds. Moreover, the suit against the hospital continued for almost a year after settlement with the doctors. Ponsoldt's argument is therefore without merit.[7]

### B. *Denial of Butters' Request for Notice, Discovery, and an Evidentiary Hearing*

■ Butters and Ponsoldt complain that the district court did not give more than a day's notice prior to the hearing regarding fee allocation, did not give sufficient opportunity for discovery, and did not conduct a full evidentiary hearing. The only authority they cite in support of their complaint of lack of notice is *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.*, 887 F.2d 1535, 1538 (11th Cir.1989), which held that two days' notice of a hearing regarding the issuance of a preliminary injunction was inadequate and an abuse of the district court's discretion. *All Care*, however, is distinguishable from the case at bar. *All Care* addressed the issuance of a prelimi-nary injunction for which Fed.R.Civ.P. 65(a) requires that notice be given to adverse parties so that they have a fair opportunity to oppose the injunction. *Id.* There is no such specific procedural requirement in the present case. Moreover, it is clear that the attorneys were debating fee allocation even before settlement was finalized. It thus appears that Ponsoldt and Butters had more than two months to formulate their position in the fee dispute; they could hardly have been taken by surprise. Their argument that they lacked opportunity to prepare is therefore without merit.

■ Butters and Ponsoldt also cite *All Care* in support of their contention that the court abused its discretion in not holding a full-blown evidentiary hearing on the fee allocation issue. The *All Care* court, noting that there exists a "tension between the need for speedy action and the desire for certainty and complete fairness," held that the peculiar complexities of the case before it on appeal mandated the need for the district court to hold an evidentiary hearing prior to the ruling on a motion for a preliminary injunction. *Id.* at 1539. *All Care* thus involved a motion which presents altogether different concerns for speed and certainty than a motion for attorneys' fees allocation and is therefore not directly applicable to the instant case.

An applicable general principle, however, can be drawn from *All Care*. That is, the more complex the disputed factual issues, the more necessary it is for the court to hold an evidentiary hearing. *See id.* (stating that the evidentiary hearing was necessary when "much depends upon the accurate presentation of numerous facts").

---

6. Ponsoldt also complains that F & W never made a formal motion to intervene. Apparently, the district court's jurisdiction over F & W's claim was not questioned at the hearing, however. F & W would therefore not have had reason to make such a motion.

7. Ponsoldt also asserted that the court does not have jurisdiction because F & W's claim was not ripe. This argument has merit only if the case is viewed in the light which Ponsoldt has proposed. In his view, F & W should not be considered a party to the fee dispute. Ponsoldt considers only those to whom the settlement checks were made payable (*i.e.*, Sweeney, her husband, Butters, Ponsoldt, and Brockington) to be parties to the dispute. Ponsoldt believes the court should have ordered all attorneys' fees paid into a trust account in Butters' name because he was the only party to the April 22nd agreement who remained actively involved in the case. F & W and others could then have submitted claims to Butters. If Butters denied F & W's claim for fees, then F & W would have a ripened case or controversy. The district court, as we do, however, viewed the case as involving construction of the April 22nd agreement. Because F & W was an original party to that agreement, its claim to the funds was ripe.

The allocation dispute in the instant case, however, focuses upon disagreements over questions of law rather than questions of fact. The case of *Lassiter v. Covington*, 861 F.2d 680, 683 (11th Cir.1988), which Ponsoldt cites, supports this view. *Lassiter* held that where a contract is ambiguous its interpretation is a question of fact requiring consideration of extrinsic evidence. *Id.* But *Lassiter* also states that the initial determination of whether the contract is ambiguous is a question of law not requiring presentation of evidence. A fair reading of the court's order allocating fees in the instant case indicates that the court did not consider the April 22nd agreement ambiguous. Consequently, the court naturally would not have had reason to hold a full-blown evidentiary hearing and allow discovery regarding the agreement's terms. The district court therefore did not err in refusing to grant Butters' request, a request which would require deviation from its normal procedure prior to ruling on the motions before it. *See* L.R. 220–1(c), N.D. Ga. (stating "All motions shall be decided by the Court without oral hearing unless a hearing is ordered by the Court.").[8]

### C. *The April 22, 1988 Agreement*

The April 22, 1988 fee agreement between Sweeney, Butters, and F & W is the only extant written agreement allocating monies recovered in the underlying lawsuit. This is the agreement the district court found governed the dispute. The parties, however, raise several issues regarding its enforceability.

#### 1. *Agreement Made in Violation of Legal Ethics*

■ Sweeney contends that the April 22nd agreement should not be enforced because it was formed in violation of several of the State Bar of Georgia's standards governing the conduct of attorneys.

Standard 43 provides that a lawyer should not "handle a matter which he knows or should know that he is clearly incompetent to handle without associating with him a lawyer whom he reasonably believes to be competent to handle it." The Georgia Supreme Court expounded upon this standard in the case of *In re Atkins*, 253 Ga. 319, 320 S.E.2d 146 (1984). In that case, an attorney undertook representation of a murderer against whom the state sought the death penalty. The attorney proceeded to trial unaware that a separate trial would be conducted in the sentencing phase. At the sentencing phase, he presented no evidence of mitigating circumstances and did not argue that there was a lack of aggravating circumstances. The defendant was sentenced to death. The court subsequently disbarred the attorney through application of Standard 43 because of his gross incompetence.

Sweeney asserts that F & W violated Standard 43 in that F & W knew it had no attorneys experienced in antitrust litigation and therefore should not have taken her case to begin with. Sweeney notes that in the fall of 1986 F & W assigned the bulk of the work on her case to Brockington, a lawyer fresh out of school with no antitrust experience. F & W did not obtain the advice of Jenkins, the antitrust expert in Washington, D.C., until the summer of 1987. Moreover, F & W did not associate with Butters on the antitrust aspect of the case until April of 1988.

Brockington's inexperience may have delayed the antitrust aspect of the suit com-

---

**8.** This Court's decision in *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292 (11th Cir. 1988), a case not cited by Butters or Ponsoldt, bears mentioning. *Norman* involved an award of attorneys' fees rather than an allocation of fees according to an agreement. The *Norman* court held that a district court is not required to hold an evidentiary hearing prior to making an award of fees. In so holding, the Court noted that the trial court itself is an expert on issues surrounding attorneys' fees and may consider its own knowledge and experience in reaching judgment. *Id.* at 1303. The court stated that only when there is a dispute regarding a "material historical fact" should an evidentiary hearing be required. *Id.* at 1304. The only issue of fact in dispute here appears to be whether Butters and Ponsoldt acted unethically in their representation of Sweeney. This issue is relevant not to the actual allocation of fees, but to the question of whether these attorneys should forfeit their fees to Sweeney once allocated. Under the *Norman* court's view too, then, an evidentiary hearing should not be required.

ing into bloom, but in no way resembles the incompetence of the attorney in *In re Atkins*. The delay, moreover, apparently caused Sweeney no harm in that her monetary success in the suit eventually came about via the antitrust claim. It should also be pointed out that the antitrust claim was only one of seven counts in the complaint.[9] Sweeney has not complained that F & W's attorneys were inexperienced in handling the six other counts. Sweeney's argument regarding Standard 43 is therefore without merit.

■ Sweeney also contends that the agreement was made in violation of Standards 45(f) and 31(c). Standard 45(f) prohibits an attorney from settling a case without the client's authorization.[10] Standard 31(c) forbids an attorney to acquire a proprietary interest in the client's cause of action, with the exception that an attorney may contract with the client for a reasonable contingency fee. The April 22nd agreement provided that the settlement should be approved not only by Sweeney, but also by Butters and F & W. Because the agreement provides for Sweeney's approval of a settlement offer, and because she actually did consent to the settlement, there appears to be no violation of Standard 45(f). When Standard 45(f) is read in conjunction with Standard 31(c), however, it appears that the agreement may have violated the State Bar Rules. The agreement requires that the attorneys approve the settlement. In this case where the size of the fee is contingent upon the amount recovered, it appears that the attorneys may have obtained a proprietary interest in the case by writing into the agreement this requirement of attorney approval.[11] F &

W does not refute this argument.[12] It should be pointed out, however, that under Georgia case law even if portions of the fee agreement violate the canons of ethics the agreement is still enforceable if the objectionable provisions are not at issue and can be severed from the rest of the agreement. *Rasmussen v. Nodvin*, 174 Ga.App. 203, 329 S.E.2d 541, 543 (1985). Sweeney and her attorneys apparently never disagreed over whether to accept the settlement. Consequently, the issue of a possible attorney veto over settlement never arose. Therefore, this possibly unethical provision does not render the agreement unenforceable.

■ Sweeney also argues that the April 22nd agreement violated Standard 31(d)(1) which requires that a contingent fee agreement state the method by which the fee is to be determined, including percentage due the attorney in the event of settlement, trial, or appeal, and whether expenses are to be deducted from the recovery before or after the contingent fee is calculated. Sweeney complains that the agreement is ambiguous as to whether the expenses were to be deducted from her share or deducted prior to the calculation of shares. When the agreement is read in its entirety, however, the intent of the parties is clear. The agreement states that Sweeney is to pay the expenses of the litigation "as they come due" and also makes reference to her continuation of her fundraising activities. It seems clear that the parties assumed Sweeney would take responsibility for the expenses. Consequently, the one phrase in the agreement which might seem ambiguous is not so in context: "The client hereby authorizes [F & W and Butters] to pay

---

9. The importance of the antitrust issue apparently did not even emerge in the litigation until the suit had been underway for nearly a year. Initially, the defendants did not bring in an antitrust expert either.

10. *See also* Georgia Court & Bar Rules, EC 7–7, stating that "it is for the client to decide whether he will accept a settlement offer."

11. Standard 31(c) allows for contingency fees. It does not state, however, that an attorney may retain a veto over settlement in order to possi-

bly increase the contingency by going to trial or negotiating further against the client's wishes. The attorney approval requirement of the April 22nd agreement might result in such a situation.

12. F & W merely asserts that Sweeney did not raise the Standard 31(c) argument in the district court. Therefore, this Court should not consider it on appeal. *Lee v. Celotex Corp.*, 764 F.2d 1489, 1492–93 (11th Cir.1985) (holding that factual findings by the district court were needed before a newly articulated legal theory could be considered).

from the proceeds of any recovery any and all expenses which are outstanding at the time of the disbursement of the proceeds of any recovery." In context, it would be nonsensical to interpret that phrase as authorizing F & W and Butters to pay their own expenses out of their own share of the recovery.

■ Sweeney further states that the agreement violated Standard 31(a) which forbids excessive fees, arguing that 50% is an unconscionably large percentage of the recovery in view of Sweeney's obligation to pay all expenses and the term of the agreement granting all court-awarded attorneys' fees to F & W and Butters in addition to their contingency fee. As Sweeney notes, the court made no ruling as to the reasonableness of the fee arrangement. The court did, however, comment on it in a conference, stating that the size of the fee did not appear excessive in view of the peculiarities and difficulties of the case. Sweeney presented affidavits of two law professors who reviewed relevant documents in the case. One concluded that the case was not so complex as to warrant a 50% contingency. The other concluded that the fee was the maximum which could be permitted in the case. In view of the district court's superior familiarity with the case, there appears no reason to accept the two law professors' opinions of the fee over the court's assessment. *See Norman,*

836 F.2d at 1303 (stating that the court should be considered an expert on attorneys' fees). *See also Zaklama,* 906 F.2d at 652–53 (enforcing a 50% contingency agreement); *Rasmussen,* 329 S.E.2d at 542–43 (same).

■ Sweeney also argues that it was inappropriate to have as a term of the agreement a grant to F & W and Butters of court-awarded attorneys' fees in addition to the contingency. Eleventh Circuit precedent can be construed as regarding such court-awarded fees as belonging to the litigant in the event that the lawyer was paid on a contingency basis, the court award being viewed as a reimbursement for fees the client paid through the contingency agreement. *See Pharr v. Housing Auth. of Prichard,* 704 F.2d 1216, 1218 (11th Cir. 1983), *overruled in part on other grounds,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *but see Tic–X–Press, Inc. v. Omni Promotions Co. of Ga., Inc.,* 815 F.2d 1407, 1423–24 (11th Cir.1987) (approving of the district court's award of fees to the attorney in excess of those available under the contingency agreement). However, the district court did not award attorneys' fees in addition to those earned under the fee agreement. The point, consequently, does not affect the enforceability of the fee contract. *See Rasmussen,* 329 S.E.2d at 543.[13]

---

13. Sweeney finally argues that the attorneys violated Standard 61 after the settlement by not disbursing to her at least some portion of the funds immediately. This argument has nothing to do with the actual terms of the fee contract, but Sweeney contends that the attorneys' unethical behavior in the contract's formation led them to act unethically in the contract's enforcement. She views this as all the more reason not to give the April 22nd agreement effect.

Standard 61 requires an attorney to notify a client promptly that the attorney is in receipt of the client's funds and to deliver those funds promptly to the client. The Georgia Supreme Court has most frequently invoked this standard to disbar or discipline an attorney when the attorney fails to inform the client that an adverse party has paid a settlement or judgment due the client and keeps the funds for the attorney's own benefit. *See, e.g., In re Barge,* 255 Ga. 177, 336 S.E.2d 252 (1985) (attorney waited 4 years before telling client that insurance company had paid settlement and yet another year

before delivering the funds to her); *In re Harrison,* 255 Ga. 77, 335 S.E.2d 564 (1985) (attorney failed to notify client-estate of receipt of $78,000 and then was unable to account for the entire sum).

In the instant case, the settlement funds were deposited into an account in the names of Sweeney, her husband, Butters, Ponsoldt, and Brockington. Her actual complaint appears to be not that the funds were not delivered but that Butters and Ponsoldt as co-signatories on the account refused to authorize her withdrawal of 50% of the funds. Sweeney's argument ignores Georgia's attorneys' lien statute which allows an attorney to retain the client's funds in the attorney's possession until the attorney's claims for fees are satisfied. *See* Ga.Code Ann. § 15–19–14(a) (1990). Prior to entry of the order disbursing funds, it was not clear that the district court would view the April 22nd agreement, which allowed Sweeney 50% of the settlement, as controlling. Some parties, including Sweeney, were arguing for fees to be disbursed

### 2. Attorney Discharged Before Fulfillment of the Agreement

Sweeney also argues that because F & W was discharged before the termination of the case it should not be paid on a contingency basis. Sweeney states that after Brockington left F & W Sweeney discharged the firm in order to continue her attorney-client relationship with Brockington, Hinton, Butters, and Ponsoldt. Because F & W was discharged prior to the realization of the contingency, Sweeney argues that F & W should be relegated to quantum meruit recovery. *Myszka v. Henson & Henson, P.C.*, 170 Ga.App. 878, 318 S.E.2d 672, 673 (1984) (holding that a discharged firm's recovery is limited to quantum meruit). *See also Zaklama*, 906 F.2d at 652 (stating that rights under contingency fee contracts are governed by state law). Butters and Ponsoldt join Sweeney in this argument.

F & W, however, was not actually replaced by new counsel. Though the firm may have been technically released from responsibility for the case, Sweeney's relationship with Brockington and Hinton, the former F & W attorneys, was a continuous one. F & W argues that it merely delegated its duties under the contract to Brockington and Hinton while retaining its right to payment. Sweeney wrote the letter to F & W relieving it of responsibility for the case only at F & W's request. In F & W's view, Brockington and Hinton took over F & W's duties under the contract and continued to represent F & W's interest in the case. Brockington clearly viewed her role as a delegatee as evidenced by her March 14, 1989 letter to F & W (copied to Sweeney and Butters) agreeing to take her fee out of F & W's share under the April 22nd agreement. Hinton apparently also had a similar agreement with F & W. Such a

delegation of a duty to perform a personal service is permissible under Georgia law where the obligee consents to the assignment. *See, e.g., Dennard v. Freeport Minerals Co.*, 250 Ga. 330, 297 S.E.2d 222, 226 (1982). Sweeney not only consented to the assignment but requested it. *Myszka* is therefore inapplicable.

The facts of *Myszka*, however, are compellingly similar to the instant case. The firm's attorney who was in charge of Myszka's case left the firm, taking Myszka's case files with him. Myszka discharged the firm in order to continue his attorney-client relationship with the individual attorney he had had contact with at the firm. Myszka, therefore, also did not retain entirely new counsel. The *Myszka* court, however, did not find, and the parties apparently did not argue, that the departed attorney, the firm, and the client viewed the departed attorney as continuing to represent the firm's interest in the fee agreement and as carrying out the firm's obligations under it. The district court in the instant case, however, found it so clear that the parties intended to continue under the April 22nd agreement that it reformed the agreement to reflect that intent under the powers of equity. *See Weil Brothers–Cotton, Inc. v. T.E.A., Inc.*, 181 Ga.App. 122, 351 S.E.2d 670, 674 (1986) (stating that reformation of an instrument is decreed where its words do not reflect the intent of the parties); *but see Deck v. Shields*, 195 Ga. 697, 25 S.E.2d 514, 517 (1943) (court's power to reform a contract cannot extend so far as to write an entirely new contract). It is this evidence of the intent to continue under this April 22nd agreement which distinguishes *Myszka*. Sweeney is therefore incorrect in her contention that *Myszka* bars enforcement of the April 22nd agreement.[14]

---

on a quantum meruit basis which could have reduced Sweeney's portion to below 50%. Consequently, there remained a question as to whether the entire 50% even belonged to her. Her argument that Butters' and Ponsoldt's refusal to authorize release of the funds pending the court's resolution of this matter was unethical is therefore without merit.

**14.** Brockington also argues that the April 22nd agreement became void when Sweeney relieved F & W of responsibility for the case, citing *Myszka* and other Georgia cases which hold that where an attorney is discharged prior to realization of the contingency the attorney's compensation should be based on quantum meruit. Brockington contends, without citation of caselaw, that the agreement is void as to *all* parties to it. She does not explain how or why she took

## D. *Reformation of the Agreement Without Use of a Lodestar*

 Ponsoldt argues that the district court erred in interpreting the April 22nd agreement as providing that the attorneys share the contingency purely on the basis of hours expended rather than on the basis of a lodestar calculation arrived at by consideration of the factors enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), or some similar system of valuing hours. The district court addressed the issue of weighting or valuing hours but found that because the agreement unambiguously stated that the fee was to be divided on a pro rata basis determined by the hours each party spent on the case, there was no basis for reading into the agreement a lodestar system.

Ponsoldt asserts that his oral agreement with Butters unambiguously stated that he would be paid on a lodestar basis, sharing in the contingency directly. As the district court held and a plain reading of the contract reflects, however, Ponsoldt was not a party to the April 22nd agreement, either statedly or impliedly. Discussion surrounding the formation of the agreement appears to indicate an understanding that Butters would pay Ponsoldt as a consultant. This was part of the reason Butters needed the $20,000 Sweeney could get from fundraising prior to the realization of the contingency. The district court consequently added Ponsoldt's consultation hours in with Butters' and disbursed the resulting figure to Butters with instructions to pay Ponsoldt according to whatever separate agreement the two had.

Ponsoldt does not present any persuasive reason or precedent for reversing the district court's reading of the plain language of the agreement. The court's determination not to use a lodestar in allocating fees must therefore be upheld.

## E. *District Court's Disbursement Under the April 22nd Agreement*

Brockington has asserted that if this Court holds the April 22nd agreement enforceable, the case should be remanded to correct three errors the court made in its application of the agreement.

### 1. *Failure to Require Documentation of Hours*

 Brockington complains that the district court refused to require Butters and Ponsoldt to document the hours they spent on the case. Both attorneys merely presented the court with a total figure without any breakdown showing how the hours were spent and without timesheets or any evidence that they made notation of the hours spent on a daily basis. Brockington claims that the lack of proof of hours is particularly egregious because, following a meeting on April 16, 1989 of attorneys and client, Butters and Ponsoldt privately suggested to Brockington that she inflate her hours in the case to whatever number she liked and indicated that they would not contest the figure. Brockington feels the implication of these statements is that Butters and Ponsoldt intended to inflate their hours also.

Eleventh Circuit precedent has held that hours attorneys spend on a case must be documented in order to sustain an award of attorneys' fees authorized by statute. *See*

a different position in her March 14, 1989 letter agreeing to share in F & W's portion of the contingency. Without acknowledging that within her own formulation of events she was not a party to the contingency agreement and without acknowledging that she has taken the position that the contingency agreement should not be given effect as to *any* of the attorneys, she suggests that the court award her $70,000 based on a quantum meruit valuation of her services *out of the fund created by the 50% contingency agreement.* She appears to assert that even though the agreement is void it still has the effect of limiting the total quantum meruit re-

covery to 50% of the entire fund. Though she states that her position is in no way adverse to Sweeney, she does not seem to grasp the possibility that if quantum meruit is strictly applied, Sweeney's entire settlement could easily be eaten up by attorneys' fees and litigation costs. The only way to stop that from happening under a quantum meruit system would be for this Court to limit the sum of the attorneys' recovery to the 50% contingency. No party cites any caselaw in support of such a limitation. In view of the lack of law recommending Brockington's position, this Court deems it to be without merit.

*In re First Colonial Corp.*, 544 F.2d 1291, 1300 (5th Cir.) (reversing bankruptcy court's award of attorneys' fees on the ground that, *inter alia*, bankruptcy judge had neglected to require documentation of time spent and type of work done in each hour), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *Duncan v. Poythress*, 777 F.2d 1508, 1516 (11th Cir. 1985) (stating that a fee application under section 1988 must document hours), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986). The rationale for requiring some form of documentation of hours is not only to facilitate our review of an award, but also to aid the trial judge who is necessarily called upon to question the attorneys' submission of hours. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717, 720 (5th Cir.1974). That rationale is just as applicable to the district court's allocation of fees under a fee agreement as it is to statutorily awarded fees. The district court, therefore, especially in light of allegations that Butters and Ponsoldt were unethically inflating hours, should have required all attorneys to present documentation of their hours.

### 2. *Inclusion of Hours Spent Only Through Date of Settlement*

 Sweeney and Brockington note that the April 22nd agreement provided for representation of Sweeney in her pending action on all claims against the doctors *and* the hospital. The settlement in May 1989 was with the doctors only; Sweeney thereafter continued her suit against the hospital. That suit was not resolved until April 1990 and did not produce an independent fund out of which attorneys' fees might be paid. Sweeney had dismissed Ponsoldt and Butters in June 1989 when it became clear that their interest in the settlement fund had become adverse to hers. Sweeney therefore had to continue the suit against the hospital without them. Yet the court did not provide for payment of the fees incurred in the continuation of the suit out of the settlement fund.

The court's statement that "[t]he attorneys performed their part under the agreement, as evidenced by the settlement with

the doctors," is puzzling. The fee agreement clearly calls for representation in the entire suit, not just as to the doctors. It appears, therefore, that disbursement of the funds was premature. Provision therefore must be made on remand for payment of the attorneys who continued the suit against the hospital out of the settlement fund. Brockington was one of the attorneys who continued representation of Sweeney to the conclusion of the underlying suit. The hours she spent in concluding the matter should be added on to her hours spent up until settlement with the doctors. Likewise, the hours of anyone she associated on the case to aid her in conclusion of it should be added on to her total. Her total hours will thus increase F & W's total. F & W should then pay Brockington and whomever she associated on the case to bring it to conclusion.

### 3. *Jenkins' Fee*

 Before Brockington left F & W, Sweeney contacted Jenkins for input on the antitrust aspects of the case. Jenkins obtained case files from F & W, conferred with Brockington, and produced a lengthy memo which supposedly became the roadmap for the antitrust claim. Jenkins billed F & W based on the hours she spent on the project. F & W presented the bill to Sweeney as an expense; the bill remained unpaid at the time of settlement. The district court deemed Jenkins' fee to be an expense which Sweeney should pay out of her settlement recovery. Sweeney apparently has now paid the fee.

Brockington contends that the hours Jenkins spent, which resulted in the bill, should be added into F & W's total hours and then paid for by F & W rather than by Sweeney. Brockington does not consider Jenkins' fee to be one of the "expenses" of litigation for which Sweeney agreed to be responsible as they came due under the April 22nd agreement. Rather, Jenkins' fee is the attorney's fee of a consultant whom F & W associated on the case for a specific purpose.

This argument has merit. Though the April 22nd agreement does not define "expenses," it clearly contemplates "attorneys' fees" and "expenses" as two separate costs of litigation. The agreement states that the attorneys will be paid out of the 50% contingency which is to be divided between Butters and F & W on a pro rata basis determined by "the respective hours devoted to the action by them or *their associates and assistants* (excluding secretarial help) respectively" (emphasis added). On the other hand, the agreement states that Sweeney is responsible for reimbursing F & W and Butters "for all expenses in handling the case as they come due." This Court recently held that the term "all expenses" in an insurance contract which required the insured to reimburse the insurer for "all expenses incurred in the investigation and negotiation in the settlement of any claim" included attorneys' fees. *Commercial Union Ins. Co. v. SEPCO Corp.*, 878 F.2d 1395, 1397 (11th Cir.1989). That case, however, is inapposite. The contract under construction there did not include clauses disposing of attorneys' fees and expenses as separate and distinct costs. If, in the instant case, Sweeney is to pay as an "expense" the fee of Jenkins whom F & W associated on the case for special advice, then she should also be made responsible for the fee of Ponsoldt, an attorney whom Butters hired as a consultant. This result would, of course, be ludicrous and clearly in contention with the plain language of the fee agreement. The district court thus erred in deeming Jenkins' fee an "expense."

### F. *Forfeiture of Fees*

■ Sweeney asserts that Butters and Ponsoldt should be ordered to forfeit part or all of their attorneys' fees because they have acted unethically. As Sweeney's attorneys, they had a fiduciary relationship to her. *See, e.g., Summerlin v. Johnson*, 176 Ga.App. 336, 335 S.E.2d 879, 881 (1985). Sweeney claims they breached their fiduciary duty to her by advancing their own

interests at her expense.[15] In Sweeney's view of the situation, Butters and Ponsoldt attempted to force her into settling their dispute over fees with F & W. They allegedly felt that she had a better opportunity of negotiating the dispute with F & W because Fortson, one of the firm's named partners, was a family friend. They supposedly threatened her by suggesting that attorneys who feel undercompensated sue their clients, that they might withdraw from the case just prior to trial, and later that she would not get any settlement funds until she satisfactorily negotiated the dispute with F & W. The district court apparently heard some of Sweeney's allegations at the hearing it held to determine the allocation of fees. However, because there was no evidentiary hearing, the validity of these claims remains unclear.

The district court commented that there had been "inconsistencies in the attorneys' words and actions." The court, however, noted that they had achieved a sizeable settlement and were entitled to compensation for their work in achieving that end. The court stated that it would therefore give the attorneys "the benefit of any doubt."

To the extent that courts retain supervisory power over the attorney-client relationship, the district court has a duty to vindicate the public interest in seeing that the attorney does not ignore the best interest of the client. *See Georgia State Bd. of Pharmacy v. Lovvorn*, 255 Ga. 259, 336 S.E.2d 238, 241 (1985) (stating that the courts have general supervisory powers over the state bar and practice of law and can therefore discipline attorneys who do not act in the best interests of their clients). Under Georgia law, a court may order an attorney to forfeit his fee as punishment for unethical conduct. *See Bryan v. Granade*, 257 Ga. 219, 357 S.E.2d 92, 93 (1987); *Odom v. Hilton*, 105 Ga.App. 286, 124 S.E.2d 415, 419 (1962). If these allegations are true, the court may thus have a duty to require forfeiture of some portion

---

**15.** *See Georgia Court and Bar Rules* EC7–9 ("[A] lawyer should always act in a manner consist-
ent with the best interests of his client.").

of the fees or impose some other sanction. The issue should therefore be remanded for an evidentiary hearing to determine whether the attorneys breached their fiduciary relationship to Sweeney and whether forfeiture of attorneys' fees is an appropriate sanction.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to allocate the settlement fund in accordance with the April 22, 1988 fee agreement. We REMAND to the district court for the purpose of making adjustments in the allocation with the following instructions. The district court shall hear evidence regarding documentation of Butters' and Ponsoldt's hours and those of any other attorney in the case who has not previously presented documentation of hours. The district court shall then adjust the allocation based on that documentation if necessary. The district court shall also hear evidence relating to the alleged ethical violations of the attorneys and cause them to forfeit to Sweeney a portion of their fees if such a sanction is appropriate. The district court shall also make provision in accordance with this opinion for the payment of all attorneys' fees incurred by Sweeney in the underlying suit, including those incurred from the time of settlement with the doctors to the ultimate resolution of the case with the hospital, out of the 50% contingency fund created by the April 22nd agreement. Finally, the district court shall recategorize Jenkins' fee as an attorneys' fee, adding Jenkins' hours in with F & W's and making F & W responsible for paying Jenkins as an attorney associated with F & W on the case. Sweeney is thus to receive her full 50% of the settlement fund. Though under the April 22nd agreement she is responsible for paying the expenses of the litigation, *no* attorney's fee is to be deemed an "expense." To the contrary, *all* attorneys' fees shall be paid from the 50% contingency fund.