## 61460. ALLEN v. COBB HEATING & AIR CONDITIONING COMPANY, INC.

QUILLIAN, Chief Judge.

Plaintiff, Kenneth G. Allen, contacted the defendant, Cobb Heating and Air Conditioning Company, Inc. (Cobb), in 1971 for information on the installation of a heating and air conditioning system in his home. Because natural gas was not available at the Allen residence, Cobb recommended installation of a heat pump system. Allen did not adopt this recommendation and a contract was entered into in the latter part of 1972 for installation of an electric furnace. Installation of the heating system was completed in January 1973 with a warranty "for one year free service on installation, plus the manufacturer's warranty on equipment." Over the next three years the Allens voiced several complaints and Cobb attempted to resolve them satisfactorily. However, on September 2, 1975, more than 19 months after expiration of the service warranty, Cobb found a "CPS board" (a time delay relay board) to be defective and had to be replaced. The CPS board was not within the warranty period. Cobb had not been charging Allen for service calls even though the system was out of warranty, but Cobb refused to replace the CPS board without charge. Allen refused to replace the CPS board and Cobb wired around it. Thereafter, Mrs. Allen called Cobb on April 21, 1976, for service and Cobb billed Allen $17.50 for the call which was not paid. Later, Mrs. Allen called Cobb for another service call and Cobb refused to answer the call until the former bill was paid.

Because Cobb refused to service the equipment, Allen called the Carrier representative who recommended another electrician — Mr. Rackley, who advised Allen that the wiring was not adequate for the system — "the wire was too small for the furnace." Allen called the Cobb County electrical inspector who found the thermostat was defective and a solid state control board for the "time delay relay" was inoperative. Apparently, this was the "CPS board" which Cobb had advised Allen to replace. The Cobb County inspector also found that the wire from the fuse box to the furnace was a "fifty-five amp, aluminum cable . . . [and] your amp capacity of that system was eighty-six and half amps. . . It said thirty KW on there. And, of course, that's going to require eighty-six and a half amps minimum." The inspector notified Cobb, who had originally contracted with a private electrician to install the wire between the fuse box and the furnace, and Cobb hired another electrician, Mr. Edwards, to rewire the heating unit and he "increased the wire size to maintain a full name plate rate on the unit . . ." a 30KW unit.

Finally, Allen replaced the electric furnace with a gas furnace

and brought this action against Cobb for bad faith, alleging the electric furnace installed was not the one contracted for and the one installed was improperly wired with the electric wire providing electricity being too small for the capacity required by the furnace. A bench trial was held and the trial court determined plaintiff received what he contracted for, failed to show any damages or bad faith, and found for the defendant. Allen brings this appeal. *Held:*

Although plaintiff enumerates five errors, each concern the sufficiency of evidence to support the findings of the trial court, and we will address all in this Division. In a bench trial the court sits as the trier of fact and his findings "shall not be set aside unless clearly erroneous . . ." Code Ann. § 81A-152 (CPA § 52; Ga. L. 1969, pp. 645, 646; 1970, pp. 170, 171). The "clearly erroneous" test is the same as the "any evidence rule." *Dept. of Human Resources v. Holland,* 133 Ga. App. 616, 617 (211 SE2d 635). Thus, an appellate court will not disturb fact findings of a trial court if there is any evidence to sustain them. *Feltham v. Cofer,* 149 Ga. App. 379, 382 (254 SE2d 499).

The principal thrust of plaintiff's argument is that the contract between himself and Cobb provided for installation of a Carrier Model 40EA electric furnace, and Cobb installed a Carrier 40EB model. The contract furnace was rated at 28KW and the installed furnace was rated at 30KW — but the furnace was wired with an electrical input for a 20KW furnace. Thus, he argues, the installed furnace did not function satisfactorily and had continuous servicing problems.

It is admitted that the contract furnace was a Carrier Model 40EA with a rating of 28KW, and the installed furnace was a Carrier Model 40EB, with a rating of 30KW. However, it was conclusively proved that the installed furnace was "derated" by using a procedure approved by Carrier by disconnecting one of the heat strips within the installed furnace. This reduction in heating capacity reduced the overall KW rating to approximately that of the contract furnace.

Mr. McLane, the owner of Cobb, testified that when the plaintiff contracted for the electric furnace in 1972 the Carrier furnace being built was a 40EA. When they accepted delivery of the Carrier furnace in 1973, they received the 40EB which was the furnace then being built by Carrier. He stated that it was a better furnace, a more expensive model, and the plaintiff received a 73 model as a replacement for the 72 model. The 40EA model was obsolete and was no longer available. Both furnaces had the same "air capacity" — 3,000 cubic feet per minute. He testified that it was "exactly the same" after the installed furnace was "derated" by removing one heat strip. The man who "derated" the furnace testified that he left the heat strip inside the furnace, if one burned out a replacement was

there waiting. He was asked: ". . . did the Allens have what they contracted for, as far as the furnace is concerned? A. Yes, sir. In fact, they probably had one or two KW's more." Mr. McLane, Cobb's owner, testified it was "exactly what was contracted for . . . it just has additional heat strips." He checked it personally and "ran an amp probe" to be sure it was correctly installed. He also emphasized that during the three years he serviced the equipment, without charge, it was working perfectly each time after they serviced it. The Carrier representative testified that after he inspected the installation in December 1976 the heating and air conditioning units were working correctly. He turned the heating unit up to "where you couldn't stand to be in" the house and it was in the "high forties" or "low fifties" outside. The Cobb County electrical inspector also testified that the heating and air conditioning units were working correctly when he inspected it and approved it in 1976.

Mr. McLane testified that the 27 vents contracted for were installed. Allen stated that only 25 vents were installed. The Carrier representative testified that "[a]s far as air conditioning capacity goes and blower size, the two furnaces would be a direct replacement for each other . . . the fan motor and everything would have to be the same size . . . the air conditioning unit located outdoors . . . the condensing unit . . . it was a 38GR unit . . . Q. Were those the same systems that were called for in the contract? A. Yes. That is the model number, series that is called for in the contract." The Carrier representative also testified that "the disconnection of one [heating] element [in the installed furnace] would give you within one KW of the actual capacity of this [contract] furnace."

The trial court's finding of the facts were authorized by the evidence and were not "clearly erroneous." See *Farmer v. Farmer,* 147 Ga. App. 387 (1) (249 SE2d 106). There was some evidence from which the trial court could have found the facts stated in his order. Therefore, we must affirm under the "any evidence rule." *Preferred Risk Mutual Ins. Co. v. Thomas,* 153 Ga. App. 154 (264 SE2d 662).

*Judgment affirmed. McMurray, P. J., and Pope, J., concur.*

DECIDED APRIL 7, 1981.

Kenneth G. Allen, *pro se.*
G. Fred Bostick, for appellee.