73055. WEIL BROTHERS-COTTON, INC. v. T. E. A., INC.
73056. WEIL BROTHERS-COTTON, INC. v. J. R. CURRY FARMS, INC.
(351 SE2d 670)

McMURRAY, Presiding Judge.

Plaintiff Weil Brothers-Cotton, Inc. brought separate lawsuits against T. E. A., Inc. and J. R. Curry Farms, Inc. in the Superior Court of Randolph County. In each lawsuit, plaintiff alleged that the respective defendant was liable to plaintiff for the breach of a contract of sale. Specifically, it was alleged that under the provisions of the contracts, each defendant agreed to sell and deliver to plaintiff the total number of pounds of cotton allocated to the defendant pursuant to the United States Department of Agriculture Payment-In-Kind Program of 1983/1984; that each defendant failed to deliver all of the cotton which was allocated to it under their Payment-In-Kind contracts with the Commodity Credit Corporation ("CCC"); that it was necessary for plaintiff to replace the cotton which each defendant failed to deliver; that the replacement cost to plaintiff was 72.02 cents per pound; that the replacement cost was 17.2 cents per pound over and above the contract price of 55.00 cents per pound; that defendant T. E. A., Inc. failed to deliver 15,502 pounds of cotton, making it liable to plaintiff in the amount of $2,638.44; and that defendant J. R. Curry Farms, Inc. failed to deliver 22,418 pounds of cotton, making it

liable to plaintiff in the amount of $3,815.54.

The respective defendants answered the complaints and denied the material allegations set forth therein. Additionally, each defendant asserted that its contract should be reformed in equity because of a mutual mistake of the parties.

Following discovery, the cases proceeded to trial. In the interest of judicial economy, the cases were tried together. The evidence adduced in the trial court demonstrates the following facts:

On February 16, 1983, plaintiff authorized Dorothy Hill to act as its purchasing agent for the purchase of cotton under the Payment-In-Kind program of 1983/1984. According to Austin Wade, one of plaintiff's representatives, Ms. Hill was not authorized to negotiate the terms and conditions of the cotton contracts; she was only authorized to solicit the sale of Payment-In-Kind (PIK) cotton.

The Payment-In-Kind program was authorized by the Agricultural Act of 1949 and the Commodity Credit Corporation Charter Act. Tom Hilton, a representative of the United States Department of Agriculture Agricultural Stabilization and Conservation Service (ASCS), explained that the PIK program was designed to improve the cotton market by decreasing the supply of surplus cotton held in CCC warehouses. The surplus cotton consisted of cotton which had been forfeited to the government in prior years pursuant to non-recourse loans. Under the PIK program, farmers could sign up to receive surplus cotton if they agreed to divert a portion of their land to conservation use. The amount of cotton which a farmer was to receive depended upon the amount of land diverted to such use and the farmer's proven yield.

Plaintiff, by and through its agent Dorothy Hill, contracted with each defendant for the purchase and sale of cotton which each was allocated pursuant to the PIK program. Representatives of the respective defendants testified it was the defendants' intention to sell to plaintiff the surplus cotton which defendants were to be allocated. Each defendant's representative averred defendants did not intend to sell their 1983 cotton to plaintiff, and that that was discussed with Dorothy Hill. Dorothy Hill concurred. She testified that the PIK program was designed to eliminate surplus cotton stored in government warehouses; that the price for the surplus cotton was cheaper than the cotton prices which prevailed at the time; that she did not intend to include 1983 cotton in the contract; and that that was the mutual intention of the parties.

Plaintiff's vice-president disagreed with Dorothy Hill's assessment. He testified that the possibility existed from the outset that farmers would be required to place their 1983 cotton crop into the PIK program; and that plaintiff did not intend to exclude that cotton from the contract.

Each contract between plaintiff and the respective defendants provided as follows: "On the terms and conditions and at the price set forth below, Seller hereby agrees to sell and deliver and Buyer hereby agrees to purchase and take delivery of *the total number of pounds of cotton allocated to Seller under Seller's contract with the Commodity Credit Corporation* ('CCC') (a copy of which is attached hereto) entered into by Seller . . . and CCC pursuant to the United States Department of Agriculture ('USDA') Payment-In-Kind Program of 1983/1984 (7 CFR 770). Seller agrees to keep his contract with CCC in full force and to perform his obligation and exercise his rights thereunder. If and as soon as procedures are established by the USDA, Seller will take all action necessary to assign to Buyer, or register Buyer's interest in, Seller's right under his Payment-In-Kind Contract with the CCC to receive the cotton to be purchased and sold hereunder . . . The price for the cotton shall be as follows, net original warehouse weights: 55.00 cents per pound . . . *for bales produced in crop year 1982 and later* and 50.00 cents per pound . . . for bales produced in crop year 1981 and earlier . . ." (Emphasis supplied.)

The contracts were signed by representatives of each defendant. Dorothy C. Hill signed the contracts on behalf of plaintiff. At the time of the execution of the contracts, neither one of the defendants had entered into a PIK contract with the CCC. That was to happen several weeks later, on March 7, 1983.

The PIK contracts provided for the allocation of cotton to each defendant. Pursuant to its contract with the CCC, T. E. A., Inc. was to receive 38,901 pounds of cotton. The contract between the CCC and J. R. Curry Farms, Inc. called for that defendant to receive 63,573 pounds of cotton. The PIK contracts contained the following provision: "The operator and each producer on the farm and CCC agree to comply with the terms and conditions specified in the Appendix to this contract." Paragraph 9 (C) of the Appendix reads as follows: "[P]roducers may be required, at CCC's option, to pledge as collateral for a price support loan, in accordance with the regulations found as 7 CFR Part 1421 or 7 CFR Part 1427, an eligible quantity of the crop produced in the *1983 crop year* . . . Producers shall agree, at CCC's option, to redeem such quantity from price support loan, sell such quantity to CCC, and receive like quantities from CCC . . ." (Emphasis supplied.)

The PIK program was very popular with the nation's farmers. In fact, the program was so popular that the CCC did not have enough surplus cotton on hand to meet its contractual obligations. Thus, it became necessary for the farmers to "harvest for PIK." In other words, the farmers were called upon to place their 1983 cotton into the PIK program. Thus, on June 24, 1983, the ASCS sent each defendant a letter which read: "According to the terms and conditions

of your Payment-In-Kind (PIK) contract, you agreed to obtain a loan on your 1983 production to satisfy PIK needs if required by Commodity Credit Corporation (CCC). CCC has determined to exercise its option to require producers who are to receive their PIK from CCC inventory to obtain a loan on their 1983 production. Producers with 1983 cotton production must obtain a regular price support loan. CCC will be responsible for storage payments on the quantity needed for PIK, through the date the cotton is redeemed for PIK but not later than the last day of the 5 month PIK availability period. Again, producers who are to receive their PIK from CCC inventory *MUST* obtain a loan on their 1983 cotton production needed to satisfy their PIK."

Between June and September 1983 the government learned the precise extent of the shortfall. It was determined that there was only enough surplus cotton to meet 60% of the farmers' PIK allocation. Thus, 40% of the farmers' PIK allocation had to be derived from their 1983 cotton crop.

In the meantime, T. E. Allen, president of T. E. A., Inc., wrote the following to "Mrs. Dorothy C. Hill": "I have a letter of June 24, 1983 from Randolph County A. S. C. S. confirming the fears which I expressed earlier that I would receive no PIK cotton from reserves but would have to place my own cotton in the loan program. As you are aware, the only cotton that I shall have will be my 1983 production. I appreciate the flexibility of Weil Brothers in this difficult situation and request release from delivering PIK cotton which, in fact, doesn't exist. In return (as I expressed to you earlier), I am ready to commit my 1983 production to Weil Brothers according to the terms which we discussed earlier . . . I trust that this is an appropriate response to the sense of fairness exhibited earlier by Weil Brothers. Please let me know how and when to proceed." Plaintiff did not respond.

In October 1983 each defendant agreed to sell its 1983-1984 cotton crop to G. W. Daniel, a cotton merchant and warehouseman. Pursuant to their contracts with Daniel, defendants were to receive 72.00 cents per pound for each acceptable bale of cotton.

In late November and early December, each defendant signed a "Cotton Producer's Note and Security Agreement" with the CCC. The agreements bore the inscription "HARVEST FOR PIK." They provided that the warehouse receipts representing defendants' 1983 cotton crops "are hereby pledged to CCC as collateral security for the payment of the principal amount of the loan, interest, charges, and any other costs incurred by CCC." Pursuant to the agreements, T. E. A., Inc. obtained a "loan" from the CCC in the amount of $8,328.48 and J. R. Curry Farms, Inc. obtained a "loan" from the CCC in the amount of $13,813.94. The amount of each "loan" was

based upon a rate of approximately 55.00 cents for each pound of cotton pledged by defendants to the CCC.

Special "Harvest for PIK" loan provisions were attached to T. E. A., Inc.'s note and security agreement. The special provisions read, in part: "I, T. E. Allen, III, d/b/a T. E. A., Inc. agree that upon approval of the loan, I will redeem the loan collateral and sell it to CCC." A different document was attached to J. R. Curry Farms, Inc.'s note and security agreement. That exhibit, signed by a representative of J. R. Curry Farms, Inc., read in part: "I agree that upon Special 'Harvest for PIK' sale to CCC of my cotton, which is not stored in an approved warehouse, I will immediately accept the cotton sold to CCC as payment-in-kind."

Upon the execution of the cotton producer's note and security agreement, each defendant received a check which represented the proceeds of its "loan." Then the notes and security agreements were marked satisfied and the CCC returned the pledged warehouse receipts to defendants. In that way defendants were paid for their 1983 cotton: and their cotton was used to satisfy the CCC's PIK obligations.

The respective defendants delivered the surplus cotton which they received under the PIK program to plaintiff and plaintiff paid defendants for that cotton. However, defendants refused to deliver the "Harvest for PIK" portion of their PIK allocation. Plaintiffs demanded delivery of the 1983 PIK cotton. When delivery was not made, plaintiff turned to other cotton producers to cover its outstanding contracts. Thereafter, plaintiff instituted these actions.

Upon the conclusion of the trial, the jury returned a verdict in favor of each defendant. Judgment was entered in accordance with the verdict and plaintiff moved for a new trial. The new trial motion was denied by the trial court and plaintiff appealed. *Held*:

1. Plaintiff asserts the trial court erred by charging the jury concerning the reformation of contracts and by admitting parol evidence which was in conflict with the written terms of the agreements. We disagree.

"A mistake, either of law or fact, is cognizable in equity and affords a remedy therein by reformation of the instrument so as to make it express the true intention of the parties on a proper cause being made, but such a jurisdiction will always be cautiously exercised, and to justify it the evidence must be clear, unequivocal, and decisive. Code, § 37-203; *Wyche v. Greene*, 11 Ga. 159; *Ligon's Administrators v. Rogers*, 12 Ga. 281; *Wyche v. Greene*, 16 Ga. 49; *Green v. Johnson*, 153 Ga. 738 (113 S.E. 402); *White & Hamilton Lumber Co. v. Foster*, 157 Ga. 493, 500 (122 S.E. 29); *Deck v. Shields*, 195 Ga. 697 (25 S.E.2d 514); *Yablon v. Metropolitan Life Ins. Co.*, 200 Ga. 693 (38 S.E.2d 534). A court of equity will reform a contract of sale

when, from mutual mistake or mistake common to both parties, an instrument does not express the true agreement of the parties." *Prince v. Friedman*, 202 Ga. 136, 138 (42 SE2d 434). As it is said: "Reformation of a written instrument will be decreed when the words that it contains do not correctly express the meaning that the parties agreed upon, as the court finds to be convincingly proved. The writing may omit a provision that they agreed should be put in; or it may contain a provision that they agreed to leave out or that was not in fact assented to." 3 Corbin on Contracts, § 614, p. 713 (1960). See also White & Summers, Uniform Commercial Code, § 2-12, p. 94 (1980).

"In a suit for reformation of contract based upon alleged mutual mistake, the parol evidence rule does not bar introduction of testimony as to the oral agreement reached by the parties which the writing was intended to reflect. *Cotton States Life Ins. Co. v. Carter*, 65 Ga. 228 (1880); *Green v. Johnson*, 153 Ga. 738 (7) (113 SE 402) (1922)." *Georgia Farm &c. Ins. Co. v. Wall*, 242 Ga. 176, 179 (249 SE2d 588). See *Vann v. Williams*, 165 Ga. App. 457, 459 (299 SE2d 908). This is so even where the written instrument was signed by the party seeking reformation. See 3 Corbin on Contracts, § 607, p. 664. See also *Georgia Farm &c. Ins. Co. v. Wall*, 242 Ga. 176, 179-180, supra.

In view of the evidence that the written contract did not reflect the true agreement of the parties, it cannot be said that the trial court erred in charging the law of reformation or by admitting parol evidence concerning the true agreement. These enumerations of error are without merit.

2. Plaintiff contends the trial court erred in refusing to permit plaintiff to introduce evidence concerning the interpretation which other farmers gave to plaintiff's contracts. (In an offer of proof, plaintiff demonstrated that out of 5,000 "PIK" contracts which plaintiff entered only three farmers refused to deliver the "Harvest for PIK" portion of their allocation.) The trial court did not err in excluding the proffered evidence. "In a controversy between two persons regarding a given subject-matter, evidence as to what occurred between one of them and a third person with reference to a similar, though entirely distinct, transaction is irrelevant." *Merchants Nat. Bank of Rome v. Greenwood*, 113 Ga. 306 (38 SE 826). Accord *Haggins v. Employees' Retirement System*, 255 Ga. 352, 355 (3) (338 SE2d 1).

It cannot be said that the evidence which plaintiff sought to introduce was sufficient to demonstrate a usage of trade in the cotton business. See in this connection OCGA § 11-1-205 (2). Accordingly, the evidence was not admissible along that line.

*Judgments affirmed. Carley and Pope, JJ., concur.*

DECIDED NOVEMBER 21, 1986 —
REHEARING DENIED DECEMBER 3, 1986.

*C. Richard Langley*, for appellant.
*Jesse G. Bowles III*, for appellees.