74930, 74931. THEATRE OF THE STARS, INC. v. ATLANTA WOMAN'S CLUB; and vice versa.
(363 SE2d 6)

BANKE, Presiding Judge.

In 1973, the parties entered into a written agreement whereby Theatre of the Stars, Inc. ("TOTS") leased a theater (now known as the Peachtree Playhouse), as well as an adjacent banquet room (referred to as Wesley Hall), from the Atlanta Woman's Club. The 1973 agreement was for an initial term of one year but was renewable annually for five years at the same rental rate, which renewal options

TOTS exercised through December of 1978. At the expiration of that term, the parties executed a new lease agreement (hereinafter referred to as "the 1979 agreement") for a term ending on June 30, 1984, at a rental rate which was to increase annually based on a specified formula tied to the consumer price index.

The 1979 agreement contained a provision giving TOTS the right of first refusal for the rental of a second adjacent ballroom. It also contained a provision giving TOTS the option, upon the satisfaction of certain specified conditions, to remain on the premises for an additional five-year period commencing July 1, 1984. The actual language of this option clause, the construction of which is the subject of the present litigation, was as follows: "During the first six months of 1984, landlord and tenant shall renegotiate the rental of the premises for the five-year period commencing July 1, 1984[,] and in the event that landlord and tenant cannot agree upon the terms of such rental, tenant shall have the right to let the premises from landlord at any annual rental offered to landlord, as a bona fide offer from a third party not affiliated with or related to either landlord or tenant and accepted by landlord; landlord shall offer the premises to tenant upon receipt of any such offer upon the terms contained therein, and, if tenant has not accepted such offer within ten days of the receipt thereof by tenant, landlord may let the premises to such third party upon the terms so offered to tenant. In the event that no such offer is made to landlord during the first six (6) months of calendar year 1984, then the rental for the five-year term commencing July 1, 1984, shall be upon the herein contained terms, except that the monthly rental shall be the same as that in effect for the first six (6) months of 1984."

Efforts to renegotiate the lease began in early 1984, with TOTS being represented during the negotiations by one Chris Manos. At a meeting between Manos and representatives of the Woman's Club held on March 9th, the Woman's Club requested that the annual rental be increased to $36,000 and, in addition, that TOTS pay the cost of heating the building (estimated at $10,000 annually). These terms, the substance of which are not disputed, were confirmed and accepted by Manos on behalf of TOTS in a letter dated April 24, 1984. The Woman's Club responded the following day by acknowledging in writing TOTS' intention to invoke the renewal provision but stating that "any decision to renew, at this stage, is premature." TOTS' attorney thereupon sent a letter to the Woman's Club informing it that TOTS took exception to its position that an extension was premature and maintaining that the parties had in fact already reached a new agreement to extend the lease at a base annual rental rate of $36,000.

TOTS' agreement to the demands previously set forth by the Woman's Club was specifically acknowledged by the Woman's Club in

a subsequent letter dated May 31. However, the Woman's Club went on to inform TOTS in this letter that since TOTS had not submitted a "formal contract" embodying the understanding previously reached by the parties, the Woman's Club was "going to close out negotiations and look for other prospective tenants."

On the following day, June 1, 1984, the Ruth Mitchell Dance Company presented an offer to the Woman's Club to lease the theater. The premises which were the subject of this proposed offer varied from those which were the subject of the 1979 lease agreement between the Woman's Club and TOTS in two respects: (1) The offer pertained only to a one-third portion of the Wesley Hall banquet room in addition to the theater itself, and (2) it did not include a right of first refusal with respect to the second ballroom. The proposed rental offered by Ruth Mitchell was identical to that offered by TOTS for the first 18 months; however, the amount offered by Ruth Mitchell for the subsequent three and a half years amounted to several thousand dollars more than the $36,000 per year offered by TOTS. As required by the option clause contained in the 1979 agreement, the Woman's Club forwarded the Ruth Mitchell offer to TOTS, advising that the offer had been approved for acceptance and offering TOTS continued possession of the premises, as described in the Ruth Mitchell offer, "upon the same terms that are contained in [that] offer."

On June 8, 1984, TOTS sent a letter to the Woman's Club in which it again indicated its willingness both to pay rent at the rate of $36,000 per year and to pay the estimated annual $10,000 cost of heating the premises. The Woman's Club rejected this offer and advised TOTS that its lease would terminate on June 30, 1984. Thereafter, the Woman's Club instituted a dispossessory proceeding against TOTS, which responded by filing the present action, seeking a declaratory judgment stating that the attempted termination of the 1979 lease agreement was ineffective and granting it the right to continued possession of the leased premises at the same monthly rental rate applicable during the first six months of 1984.

The dispossessory proceeding was apparently stayed pending resolution of the declaratory judgment action, which proceeded to a nonjury trial. After hearing the evidence, the trial court entered an order declaring (1) that TOTS had the right to occupy the premises until July 1, 1989, with no further right of renewal; (2) that because the Ruth Mitchell offer was not an offer to lease the same spatial premises as were the subject of the 1979 lease, TOTS was not required to match it in order to exercise its option to remain on the premises; and (3) that TOTS was nevertheless obligated to pay rent during the renewal period at the same rate as Ruth Mitchell had offered for the lesser portion of the premises to which its offer had applied. TOTS

filed an appeal from this order, and the Woman's Club filed a cross-appeal. *Held*:

1. TOTS contends that the trial court erred in ruling that the amount of rent which it was obligated to pay during the renewal period was the amount offered by Ruth Mitchell rather than the amount which it (TOTS) had been paying during the first six months of 1984, asserting that this ruling was inconsistent with the trial court's simultaneous determination that TOTS was not required to match the Ruth Mitchell offer because that offer had not pertained to the identical "premises" encompassed by TOTS' existing lease. The Woman's Club, on the other hand, contends in its cross-appeal that it was the latter portion of the trial court's reasoning which was erroneous.

We must agree with the Woman's Club that TOTS was not relieved of the obligation of matching the dollar amount of the Ruth Mitchell offer merely because that offer encompassed a *lesser* portion of the premises than did TOTS' existing lease. Clearly, if Ruth Mitchell was willing to pay more rent for less space, then TOTS was obligated to pay at least that same amount of rent for the larger portion of the building to which its option applied. It follows that *if* the Ruth Mitchell offer constituted "a bona fide offer from a third party" within the contemplation of the option clause contained in the 1979 agreement, then TOTS' failure to match the dollar amount of that offer within 10 days of being notified of it resulted in a forfeiture of its rights under the option clause. However, the court did not reach the issue of whether the Ruth Mitchell offer was "bona fide," due to its determination that the offer could not be effective unless it was for the same spatial premises as were the subject of TOTS' lease. We therefore remand the case for a resolution of this issue. If it is determined by the trial court that the Ruth Mitchell offer was not "a bona fide offer from a third party," then TOTS would be entitled to occupy the entire "premises," as that term is defined in the 1979 agreement, for a period of five years, commencing July 1, 1984, at the monthly rental that was in effect during the first six months of 1984. If, on the other hand, the trial court determines that the Ruth Mitchell offer was "bona fide," then TOTS' right to possession of the premises must be deemed as a matter of law to have terminated on June 30, 1984, due to its failure to respond to the offer within the 10-day period specified in the contract.

2. TOTS further assigns as error the trial court's ruling that its option to continue renting the premises could in no event extend beyond June 30, 1989. In this regard, TOTS contends that because one of the terms of the existing lease was the renewal option itself and because that option provided for the renewal of the lease "upon the terms contained herein," the option in effect authorized the renewal

of the lease every five years in perpetuity. In ruling to the contrary, the trial court ascertained from the written instrument, as amplified by parol evidence, that it had been the parties' intention that TOTS would have the right only to one five-year renewal of the lease. Although TOTS' negotiator, Chris Manos, testified that it was his understanding that the option provision was itself to be renewable so long as TOTS was willing to match any offer by a third party, this testimony was in conflict with other testimony presented by the Woman's Club, evincing its intention to establish only one five-year right of renewal.

Factual determinations made by the trial court upon the trial of a civil case without a jury will not be disturbed unless "clearly erroneous," a standard which is identical to the "any evidence" standard. *Allen v. Cobb Heating &c. Co.*, 158 Ga. App. 209, 210 (279 SE2d 505) (1981). Since the trial court's finding with respect to the meaning of the contractual provision in question is supported by some evidence, it will not be disturbed on appeal.

3. TOTS asserts as error the trial court's refusal to admit into evidence a writing purportedly prepared by Manos for the purpose of assisting TOTS' attorney in drafting the 1979 agreement and purportedly evincing TOTS' intent with respect to the meaning of the written renewal provision. This exhibit was objected to by the Woman's Club on the grounds that it was not dated and had not been produced in response to pre-trial discovery requests. Although the trial court refused to admit the evidence, it allowed Manos wide latitude in testifying as to his understanding of the option provision and his intent in negotiating the 1979 lease.

As the evidence in question was considered by the court via Manos' testimony, we find no cause for reversal resulting from exclusion of the writing. "It is for the reviewing court to determine whether prejudice has resulted; and if such exclusion did not prejudice the complaining party, and could not have affected the result, [any] error is harmless. [Cit.]" *Howard v. St. Paul Fire &c. Ins. Co.*, 180 Ga. App. 802, 805 (350 SE2d 776) (1986).

4. Similarily, the trial court's refusal to admit Ruth Mitchell's federal income tax returns as evidence of its alleged financial inability to meet the proposed obligations created by its lease offer cannot be considered reversible error, inasmuch as evidence of Mitchell's financial resources was already before the court in the form of certain financial statements introduced for the same purpose. See *Howard,* supra. Absent a showing by the appellant that the tax returns contained any relevant information not contained in the financial statements, we must assume that no prejudice resulted from the court's ruling in this regard. It is, of course, axiomatic that harm as well as error must be shown to secure a reversal. See, e.g., *Clements v.*

*Toombs County Hosp. Auth.*, 175 Ga. App. 651, 653-654 (334 SE2d 188) (1985).

5. The trial court's finding that the Woman's Club attempted in good faith to negotiate a new lease with TOTS prior to entertaining the Ruth Mitchell offer was authorized by the evidence and was not "clearly erroneous." *Allen v. Cobb Heating &c. Co.*, supra.

*Judgment affirmed in part and vacated in part, and case remanded with direction. Carley and Benham, JJ., concur.*

DECIDED OCTOBER 5, 1987 —
REHEARING DENIED NOVEMBER 9, 1987 — 

*R. Matthew Martin*, for appellant.
*H. Lowell Hopkins, Patrick J. McKenna*, for appellee.