A99A1526. YEAZEL et al. v. BURGER KING CORPORATION.

(526 SE2d 112)

RUFFIN, Judge.

In this case, the trial court entered a declaratory judgment in favor of Burger King Corporation (BKC), the tenant under a commercial lease, regarding the proper method of calculating rent due under the lease. The trial court further held that BKC was entitled to recover all overpayments of rent made during the pendency of the litigation, but that recovery of earlier overpayments was barred by the voluntary payment doctrine. The landlords, Jack and Rita Yeazel, appeal.[1] Because the trial court misapplied the voluntary payment doctrine and refused to consider parol evidence of the parties' intent in entering into an amendment of the lease, we reverse the judgment in favor of BKC and remand for further consideration. We also affirm in part and reverse in part the denial of the Yeazels' motion for summary judgment.

In 1980, the Yeazels leased the subject property to The Wheeler Organization, Inc. (TWO). Paragraph 3 of the lease provided that TWO would operate a Burger King restaurant on the premises in accordance with the terms of a license agreement between Paul Wheeler and BKC. In paragraph 2 of the lease, TWO agreed to pay monthly rent equal to the greater of (a) $4,000 or (b) seven percent of gross sales from the operation of the restaurant.

In 1985, Wheeler and BKC began discussions regarding a purchase by BKC of TWO's stock. According to Wheeler, before entering into such an agreement, BKC wanted to eliminate the lease provision requiring the property to be operated as a Burger King restaurant. In April 1985, TWO and the Yeazels executed a written amendment of the lease, drafted by BKC, which deleted the original paragraph 3 and substituted the following language:

---

[1] BKC does not appeal the trial court's holding that it could not recover overpayments made before the filing of this lawsuit.

> Lessee agrees to continue to operate a Burger King Restaurant on the demised premises. Lessor grants Lessee the right to use the premises for any other lawful purpose, provided however, in the event that Lessee ceases to operate a Burger King Restaurant on the premises . . . or makes any other use of the premises except the operation of a Burger King Restaurant, the monthly rental during each month of the term of this lease shall be equal to the greater of (i) one-twelfth (1/12) of seven percent (7%) of "gross sales" for the twelve (12) months immediately preceding the initial change of use (hereinafter referred to as base rent) or (ii) seven percent (7%) of gross sales from the operation of the business on the premises. The base rent shall then be increased by five percent (5%) annually for the duration of the lease term.

The rent calculations in the amendment, to be applied upon a change in use of the property, did not include the minimum monthly base rent of $4,000 set forth in paragraph 2 of the original lease. Although the amendment did not purport to delete paragraph 2, it provided that "[i]n the event there are any inconsistencies between the Lease and this Amendment of Lease, the provisions of this Amendment shall control." Wheeler and Mr. Yeazel both testified that, when they executed the amendment, it was their intent to retain the minimum monthly rent of $4,000. They believed that, reading the original lease and the amendment together, the amended lease did in fact retain such provision. If, however, the amendment were construed to have deleted the minimum monthly rent provision following a change in use, they both testified that this would be contrary to their intent and amount to a mistake.

On the same day the amendment was executed, BKC merged with TWO, purchasing all of its outstanding stock. Over the next several years, BKC continued to operate a Burger King restaurant on the property and pay rent accordingly. In March 1990, BKC ceased operating a Burger King restaurant on the property. For the next four and a half years, BKC continued to pay rent as if the $4,000 minimum base rent provision of paragraph 2 were still in effect, although it periodically increased the base rent by five percent as provided in the lease amendment.[2] On June 28, 1991, BKC sent the Yeazels a letter stating that "[a]s Paragraph #3 indicates, your rent from Burger King Corporation will be $4,000 per month with a 5% increase per year. Also, should annual gross sales of the subtenant

---

[2] BKC paid $4,000 per month through June 1992; $4,200 per month from July 1992 through June 1993; $4,410 per month from July 1993 through July 1994; and $4,630.50 per month from August 1994 through May 1998.

exceed $540,101, you will be entitled to a 7% override."[3] In August 1994, however, BKC took the position that the $4,000 minimum monthly base rent provision had been deleted by the 1985 amendment, and that it had been overpaying rent since April 1990. Nevertheless, it continued to pay rent as if the minimum base rent provision were still in effect, although it informed the Yeazels that it was doing so under protest.

In February 1995, BKC filed this action seeking recovery of the alleged overpayments, contending that they had been made by mistake. However, BKC continued paying the disputed rent directly to the Yeazels throughout the pendency of this action.[4] In their answer, the Yeazels contended that recovery was barred pursuant to the voluntary payments doctrine set forth in OCGA § 13-1-13. They also filed a counterclaim, seeking a declaratory judgment that the minimum monthly base rent provision was not deleted by the amendment. In the alternative, they sought to reform the lease pursuant to OCGA § 23-2-30 to include the minimum base rent provision.

The Yeazels filed a motion for summary judgment on July 14, 1995. In October 1995, BKC filed a "Motion for Declaratory Judgment," asking the court to declare that rent should be calculated based solely on the language of the amendment, without any reference to the $4,000 minimum base rent provision in paragraph 2 of the original lease. About a year later, in November 1996, BKC amended its complaint to seek declaratory judgment as to the amount payable under the lease. The trial court held a hearing on several pending motions, including BKC's motion for declaratory judgment and the Yeazels' motion for summary judgment. On March 6, 1998, the trial court entered an order granting BKC's motion for declaratory judgment as to the construction of the amended lease. The court expressly refused to consider parol evidence of Mr. Yeazel's and Wheeler's intent in executing the amendment, holding that the language of the amendment was unambiguous. The court further held that BKC could recover all overpayments made during the pendency of the lawsuit, but refused to let BKC recover any prior overpayments, holding that such payments were voluntary. The court subsequently entered a final judgment setting forth the specific amounts owed by the Yeazels to BKC.

---

[3] Mr. Yeazel testified that he believed BKC meant to refer to paragraph 2 of the lease amendment, instead of paragraph 3, since it was paragraph 2 that dealt with rent calculation. Gayle Cline, the author of the letter, claims that she was referring to paragraph 3 of a proposed sublease, and not to the lease or lease amendment.

[4] At the time it filed its complaint, BKC also filed a motion to pay all rent (including the undisputed portion) into the registry of the court, there to remain until the case was resolved. However, BKC apparently took no action to obtain a ruling on this motion during the four years this case was pending below.

1. As an initial matter, although the trial court purported simply to grant BKC's motion for declaratory judgment, it in fact granted final judgment on all claims raised in the case, including BKC's claim to recover money paid by mistake. The court did not hold a trial on these claims and did not accept evidence at the hearing on the motions. Rather, the court simply stated that it was making its ruling "[a]fter hearing oral argument and reviewing the record."

On appeal, neither party addresses the propriety of the trial court entering final judgment in BKC's favor without conducting a trial and without BKC having filed a motion for summary judgment. Although BKC's motion for declaratory judgment could arguably be construed as a motion for summary judgment on its claim for declaratory relief, the motion does not address BKC's right to obtain money damages from the Yeazels. Therefore, it is not clear why the trial court considered itself authorized to enter final judgment on such claim. Because the Yeazels do not raise this issue on appeal, we do not consider whether the trial court erred procedurally by entering final judgment in BKC's favor. As discussed below, the trial court committed errors of law requiring reversal.[5] In considering this case after remand, of course, the trial court should consider the procedural posture of the case.

2. Mr. Yeazel and Wheeler both testified that, in entering into the lease amendment, it was their intent to retain the $4,000 minimum monthly rent provision, and that they in fact believed such provision was not affected by the amendment. To the extent that the amendment is interpreted as effectively deleting that provision upon a change in use of the property, they testified that the amendment failed to accurately reflect their agreement. Accordingly, the Yeazels sought to reform the lease to include the minimum monthly rent provision. In rejecting the Yeazels' reformation claim, the trial court stated that it would not consider parol evidence of a mutual mistake because the language of the amendment was unambiguous. The Yeazels contend that this ruling was error, and we agree.

"In all cases where the form of the conveyance or instrument is, by mutual mistake, contrary to the intention of the parties in their contract, equity will interfere to make it conform thereto."[6] Specifically, our Supreme Court has held that

[a] petition for reformation of a written contract will lie

---

[5] See *Maddox v. Schrader*, 268 Ga. 661, n. 1 (492 SE2d 521) (1997) (application of law to facts subject to de novo review); *Dept. of Human Resources v. Woodruff*, 234 Ga. App. 513 (507 SE2d 249) (1998).

[6] (Punctuation omitted.) *Eaton Yale & Towne, Inc. v. Strickland*, 228 Ga. 430, 434 (2) (a) (185 SE2d 923) (1971).

where by mistake of the scrivener and by oversight of the parties, the writing does not embody or fully express the real contract of the parties. The cause of the defect is immaterial so long as the mistake is common to both parties to the transaction. And the negligence of the complaining party will not defeat his right to reformation if the other party has not been prejudiced.[7]

The term "mistake" refers to "some unintentional act, or omission, or error, arising from ignorance, surprise, imposition, or misplaced confidence."[8] Such a mistake may be one of fact or of law.[9] A "mutual mistake" means

a mistake shared by, or participated in by, both parties, or a mistake common to both parties, or reciprocal to both parties; both must have labored under the same misconception in respect of the terms and conditions of a written instrument, intending at the time of the execution of the instrument to say one thing and by mistake expressing another, so that the instrument as written does not express the contract or intent of either of the parties. A mutual mistake is one in which both parties participate by each laboring under the same misconception.[10]

In an action for reformation based upon an alleged mutual mistake,

the parol evidence rule does not bar introduction of testimony as to the oral agreement reached by the parties which the writing was intended to reflect. *Cotton States Life Ins. Co. v. Carter*, 65 Ga. 228 (1880); *Green v. Johnson*, 153 Ga. 738 (7) (113 SE 402) (1922).[11]

Such parol evidence is admissible even though the party seeking reformation signed the contract.[12] The fact that the parol evidence contradicts the language of the written document clearly does not bar its admissibility, since the gist of a reformation action is that the writ-

---

[7] (Punctuation and footnotes omitted.) *Curry v. Curry*, 267 Ga. 66, 67 (1) (473 SE2d 760) (1996).

[8] (Punctuation omitted.) *Hartford Accident &c. Co. v. Walka Mountain Camp &c.*, 224 Ga. 194 (160 SE2d 833) (1968).

[9] *Cheatham v. Palmer*, 191 Ga. 617, 625-626 (13 SE2d 674) (1941).

[10] (Citation and punctuation omitted.) *Hartford Accident*, supra.

[11] *Ga. Farm &c. Ins. Co. v. Wall*, 242 Ga. 176, 179 (2) (249 SE2d 588) (1978).

[12] *Weil Bros.-Cotton, Inc. v. T. E. A., Inc.*, 181 Ga. App. 122, 127 (1) (351 SE2d 670) (1986).

ten document does not accurately reflect the parties' agreement. Accordingly, the trial court erred in refusing to consider parol evidence of a mutual mistake in the execution of the lease amendment.[13]

Neither party addresses whether the fact that BKC was not an original party to the lease amendment affects the analysis of the reformation issue. OCGA § 23-2-34 provides that "[e]quity will grant relief as between the original parties or their privies in law, in fact, or in estate, except bona fide purchasers for value without notice." BKC acquired its interest in the lease not by assignment, but by purchasing all of the stock in TWO, the original tenant. It is at least arguable that, by merging with TWO, BKC in effect stands in TWO's shoes with respect to the lease. At the very least, BKC is a successor to TWO's interest in the lease, and thus in privity with TWO as contemplated in the statute.[14] Accordingly, the equitable remedy of reformation is available unless BKC constitutes a "bona fide purchaser for value without notice."

The trial court made no findings as to whether BKC was in fact a bona fide purchaser without notice. Therefore, we cannot affirm the trial court's decision under a "right for any reason" analysis unless the evidence demands as a matter of law a finding that BKC was a bona fide purchaser without notice. If the evidence does not demand such a finding, then it is for the trier of fact in the first instance to make the necessary factual finding, and we cannot assume that it would do so.

The evidence in this case shows that BKC was actively involved in the negotiations regarding the lease amendment and was in fact the driving force behind the amendment. Paul Wheeler, the principal officer and shareholder of TWO at the time, testified that when he began negotiating the sale of the corporation to BKC, BKC said that it wanted to modify the lease to allow it to operate the restaurant as

---

[13] BKC contends that there was no "mistake" since Mr. Yeazel and Wheeler both testified that they interpret the amended lease to retain the minimum monthly rent provision. This argument is disingenuous — on the one hand, BKC argues that the amendment does not mean what Yeazel and Wheeler thought it meant when they signed it; on the other hand, BKC argues that, because Yeazel and Wheeler interpret the amendment otherwise, they were not mistaken. In essence, BKC is arguing that the only type of mistake that may be corrected in a reformation action is something in the nature of a typographical error. As the Supreme Court has held, however, the term "mistake" includes an "error, arising from ignorance." *Hartford Accident*, supra. A mutual mistake occurs when the parties "intend[] at the time of the execution of the instrument to say one thing and by mistake express[] another, so that the instrument as written does not express the contract or intent of either of the parties." Id. "Reformation of a written instrument will be decreed when the words that it contains do not correctly express the meaning that the parties agreed upon." *Weil Bros.*, supra at 127 (1). The alleged "mistake" in this case is that the language used in the amendment did not effect the parties' agreement. The fact that the parties wrongly interpreted the effect of such language merely illustrates the mistake.

[14] See *Garlington v. Blount*, 146 Ga. 527 (1) (91 SE 553) (1917).

something other than a Burger King. BKC prepared a proposed amendment and gave it to Wheeler to pass along to the Yeazels. Wheeler testified that, during the negotiations, Mr. Yeazel expressed concern that the rent not decrease if the restaurant use was changed. Wheeler said that he "expressed [the Yeazels'] thoughts to Burger King, who then took those thoughts, made whatever modifications were made at the time, and resubmitted an amendment of lease."

Wheeler testified as follows during his deposition:

> Q. Did you discuss with Mr. Yeazel specifically that you wanted the minimum base rent of $4,000 always to remain in place?
>
> A. Absolutely.
>
> Q. And when you talked about the guarantee of the 5 percent increase, what you meant was if the profitability of the store went down and you were out of percentage rents and you were now into the minimum base rent, that if that occurred there would be a 5 percent increase? . . .
>
> A. That was our intent. . . .
>
> Q. Did you convey Mr. Yeazel's concern that the minimum base rent have a guaranteed increase if it went down to that to Burger King?
>
> A. That was part of my discussions with Burger King, yes.
>
> Q. Do you believe you were clear to Burger King that the minimum base rents would, in fact, remain as a minimum guarantee, as the words you used I believe were worst-case scenario?
>
> A. I think that is correct. And, in fact, I thought it was in the amendment.

Wheeler said that he "functioned as an intermediary" between BKC and the Yeazels in the negotiations regarding the amendment, and that a BKC representative was present at the signing of the amendment. Stuart Blake, BKC's corporate counsel, testified that he drafted the amendment and that Wheeler signed it "at the bequest of Burger King." The lease amendment was signed at the same time as the documents relating to the sale of TWO stock.

The evidence thus does not establish that BKC was without knowledge of the parties' understanding as to the effect of the amendment. If BKC was in fact aware that the original parties to the amendment understood that the minimum base rent provisions were not altered, then it cannot be said that BKC was simply an innocent purchaser without notice. The fact that, for more than four years after it changed the use of the restaurant, BKC continued without

objection to make rent payments in accordance with the original parties' understanding of the lease further suggests that BKC was aware of their intentions, and that it interpreted the amended lease in the same manner. BKC's June 28, 1991 letter to the Yeazels provides additional evidence that it interpreted the lease to include a $4,000 minimum base rent provision.[15]

We recognize that Wheeler's credibility regarding the negotiations over the amendment is subject to attack. For instance, Wheeler testified that Mr. Yeazel was "nice enough" to loan him $275,000 in 1988 to help him settle some business debts, suggesting that Wheeler might have a reason to want to assist the Yeazels in their current dispute with BKC. In the event of a trial, BKC would of course be entitled to present evidence contradicting Wheeler's account. However, Wheeler's credibility is a matter for the trier of fact. Although the factfinder *might* conclude that Wheeler's testimony is not credible, and that BKC did in fact lack knowledge of the parties' intent regarding the amendment, the trial court did not consider that issue in making its ruling.

Because the trial court expressly indicated that it would not consider parol evidence of the parties' intent and relied simply on the language of the amended lease, the trial court's judgment in favor of BKC must be reversed and this case remanded for further consideration.[16]

3. The Yeazels also contend that the voluntary payment doctrine bars BKC from recovering any alleged rent overpayments made during the pendency of the lawsuit. We agree.

The voluntary payment doctrine is set forth in OCGA § 13-1-13, which states that

[p]ayments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate

---

[15] Because the only issues raised by the Yeazels are whether the lease should be reformed due to a mutual mistake and whether the voluntary payment doctrine applies, we do not address the separate issue of whether the amended lease was subsequently modified by agreement or by the parties' long course of conduct to include the minimum base rent provision.

[16] Although the trial court erred in entering judgment for BKC, it correctly denied summary judgment to the Yeazels on the reformation claim. While both Mr. Yeazel and Wheeler testified that it was their intent to retain the minimum monthly rent provision, the language of the amendment provides some evidence to the contrary, and the trier of fact would be authorized to disbelieve their testimony. However, this is an issue that must be considered by the trier of fact, and it is not for this Court to make an initial determination on the issue.

necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property. Filing a protest at the time of payment does not change the rule prescribed in this Code section.

It is true that, until the trial court issued its ruling, BKC could not be sure whether the court would agree with its interpretation of the amended lease. However, the fact that construction of the lease was in doubt does not affect whether BKC was aware of all the material *facts* at the time it made the payments. To hold otherwise would essentially render the voluntary payment doctrine meaningless, since any party which voluntarily makes a payment it does not think is required could argue that the payment was involuntary because it was not sure whether its position would prevail in court.

The error in such a position is illustrated by our decision in *Dunton v. Norton*.[17] In that case, a judgment was rendered against the plaintiff on a surety bond. Although the plaintiff believed that the judgment had been fraudulently obtained, she paid the judgment and then sued to set it aside and recover the amount of her payment. We held that the voluntary payment doctrine precluded recovery of the amount paid, since "it appears that the payment was made with full knowledge of any facts such as might have rendered the judgment illegal."[18] We did not focus on whether, at the time the plaintiff made the payment, there was any doubt as to whether her position would be successful in court, but focused on whether she was aware of "facts" which "might" have made the judgment illegal.

The key question therefore is not whether BKC knew that its position would be vindicated in court, but whether it had all the facts at the time it made the payments. At the very time BKC was making the rent payments at issue, it was asserting in this lawsuit that it was not obligated to make such payments under the lease. Although BKC may not have been confident that a court would agree, it cannot seriously contend that it made the payments involuntarily in the sense contemplated by the statute — i.e., that it made the payments by mistake because it was unaware of facts showing that they were not required.[19]

Nor can it be said that BKC made the payments because it was mistaken as to the law. As demonstrated by its complaint in this action, BKC in fact believed that the law did *not* require it to make rent payments in the amount claimed by the Yeazels. Thus, although BKC may not have been confident of its position, it cannot assert that

---

[17] 42 Ga. App. 310 (155 SE 775) (1930).
[18] Id.
[19] See *Rod's Auto Finance v. Finance Co.*, 211 Ga. App. 63 (1) (438 SE2d 175) (1993).

it made the payments involuntarily because it mistakenly believed the law required it to do so.

Since BKC made the payments at issue with knowledge of the material facts, and not through a mistake of law, we must consider whether the fact that a lawsuit was ongoing regarding the construction of the lease takes the payments outside the scope of the voluntary payment doctrine. Nothing in OCGA § 13-1-13 suggests that the existence of a lawsuit on the subject renders the doctrine inapplicable. Rather, the statute says that a payment made with knowledge of the facts is "deemed voluntary and cannot be recovered" unless (1) the payment is "made under an urgent and immediate necessity therefor," (2) the payment is made "to release person or property from detention," or (3) the payment is made "to prevent an immediate seizure of person or property."[20]

Georgia courts have strictly interpreted the requirement that, to be recoverable, a payment must be made under an "urgent and immediate" necessity or in order to prevent an "immediate" seizure. For example, it has been held that a threat to levy on a judgment if payment is not made does not constitute such an immediate threat as to render the payment involuntary.[21] Furthermore, in keeping with other jurisdictions, Georgia courts have held that "[m]ere apprehension or threats of a civil proceeding to enforce a claim, unaccompanied by any act of hardship or oppression, does not render a payment in response thereto involuntary in the sense that it can be recovered back."[22] Citing *Cooper v. Public Finance Corp.*,[23] CJS states that "this rule also applies although the payment is not made until *after* legal proceedings to recover on the asserted claim have actually been instituted in good faith."[24]

In *Cooper*, a finance company sued its debtors for failing to make payments under a note and security agreement. After suit was filed, the debtors made some payments and eventually paid the entire amount after a default judgment was obtained. They then filed two

---

[20] OCGA § 13-1-13. BKC's reliance on *Gulf Life Ins. Co. v. Folsom*, 256 Ga. 400 (349 SE2d 368) (1986) is misplaced. In that case, the Supreme Court stated that a plaintiff generally can "recover a payment mistakenly made when that mistake was caused by his lack of diligence or his negligence in ascertaining the true facts and the other party would not be prejudiced by refunding the payment[.]" Id. at 402. In this case, however, BKC made the payments voluntarily, with actual knowledge of all the facts, and not simply due to its negligence in failing to ascertain the facts. Although BKC could arguably claim that its payments before August 1994 were made because of its negligence or lack of diligence in discovering the true facts, those payments are not at issue in this appeal.

[21] See *Dunton*, supra; *West v. Brown*, 165 Ga. 187 (140 SE 500) (1927).

[22] (Punctuation omitted.) *Strachan Shipping Co. v. City of Savannah*, 168 Ga. 309, 315 (3) (147 SE 555) (1929). See 70 CJS, Payment, § 108, p. 89.

[23] 146 Ga. App. 250 (246 SE2d 684) (1978).

[24] (Emphasis supplied.) 70 CJS, Payment, § 108, p. 109.

actions against the finance company, alleging that the loan transactions were illegal and void and seeking to set aside the default judgment. We held that

> all payments by the plaintiffs were voluntary. Voluntary payments began after suit was filed — before judgment, and continued after judgment until the debt was discharged — except for a few dollars. Under the facts of this case, such voluntary payments cannot be recovered . . . unless within an exception stated in the Code. We find no such exception.[25]

Clearly, therefore, the fact that there is pending litigation regarding a party's obligation to pay money does not render payments made during the litigation involuntary unless they come within an exception specified in OCGA § 13-1-13. While the existence of the lawsuit may indicate that there is a dispute as to the party's obligation to make the payment, the statute states that "[f]iling a protest at the time of payment does not change the rule prescribed in this Code section."[26]

Although BKC may have feared that the Yeazels would take action if it failed to make the payments in the amount demanded, there is no evidence that the payments were made to counter an *immediate* threat to person or property so as to come within an exception to OCGA § 13-1-13. BKC contends that the payments were necessary because the Yeazels could seize the leased premises in the event of default. However, the lease requires the Yeazels to give BKC 30 days written notice of their intent to terminate the lease because of any default and gives BKC the right to cure any such default before the expiration of the 30-day period. Accordingly, until such time as the Yeazels have given BKC notice of intent to terminate, it cannot be said that payment of any disputed amount was necessary to avoid an *immediate* seizure of property.

We note that, in July 1994, more than six months before BKC filed this action, the Yeazels sent BKC a notice of default based on its alleged underpayment of rent. BKC responded to this notice by paying the disputed rent "under protest." It is at least arguable that this particular payment was made under an "urgent and immediate necessity" or to prevent an "immediate" seizure of property (although the trial court held that this payment was not recoverable, and BKC did not appeal this ruling).[27] However, we do not believe that this one

---

[25] (Citations omitted.) *Cooper*, supra at 255-256 (2).

[26] OCGA § 13-1-13.

[27] We also note that the default notice did not inform BKC that the lease would be terminated because of the default, as required by the default provisions of the lease.

default notice, sent six months before suit was filed, means that all *subsequent* payments made by BKC, in particular those made after the filing of this lawsuit, were necessary to prevent "immediate" action by the Yeazels. Moreover, we have held that

> if the law affords to the person from whom the payment is exacted an immediate and adequate remedy to resist payment, he cannot be said to have acted under compulsion, if, by neglecting to avail himself of such remedy, he elects to make the payment demanded of him.[28]

If, during the course of this action, the Yeazels had given BKC notice of their intent to terminate the lease due to alleged underpayment of rent, BKC could have moved for an injunction preventing the Yeazels from declaring default until the rent dispute was resolved.[29] We note that the Yeazels' original answer requested equitable relief by seeking reformation of the lease. "Equity having assumed jurisdiction will retain it to afford complete relief between the parties as to the subject matter of the complaint."[30] Because BKC elected to pay the disputed amounts to the Yeazels, rather than availing itself of remedies to resist payment, its payments must be considered voluntary for purposes of OCGA § 13-1-13. Accordingly, the voluntary payment doctrine prevents BKC from recovering any payments made during the pendency of this action, and the Yeazels were entitled to summary judgment on this issue.

*Judgment affirmed in part and reversed in part and case remanded. Johnson, C. J., Pope, P. J., Andrews, P. J., and Smith, J., concur. McMurray, P. J., and Eldridge, J., dissent.*

McMurray, Presiding Judge, dissenting.

I fully agree the trial court erred in refusing to consider parol evidence of an alleged mutual mistake. Nevertheless, I would affirm under the "right for any reason" rule, because the intervening equity of a bona fide purchaser for value precludes reformation of this lease. Furthermore, the voluntary payment rule does not bar recovery of alleged overpayments made during the pendency of this action. I therefore respectfully dissent from the judgment of reversal.

Plaintiff-appellee Burger King Corporation ("BKC") brought this action against defendants-appellants Rita D. Yeazel and Jack H. Yeazel, seeking to recover money (rent) allegedly overpaid by mis-

---

[28] (Punctuation omitted.) *Dunton*, supra at 311.

[29] See generally *Theatre of the Stars v. Atlanta Woman's Club*, 184 Ga. App. 810 (363 SE2d 6) (1987) (tenant sought declaratory judgment that attempted termination of lease was ineffective).

[30] *Kirk v. Hasty*, 239 Ga. 362, 364 (4) (236 SE2d 667) (1977).

take under a 20-year lease of commercial property in Cobb County, Georgia. Defendants defended on the ground that all payments were voluntary and counterclaimed for reformation of the lease as amended, for breach of contract, and for declaratory judgment. Plaintiff amended its complaint, also seeking declaratory judgment. The following undisputed facts are relevant to the disposition of this appeal:

In 1980, defendants leased their property to The Wheeler Organization, Inc. ("TWO") to operate a Burger King restaurant as authorized in a franchise agreement between BKC and Paul Kelley Wheeler. TWO agreed to a monthly rental equal to the greater of (a) $4,000 or (b) seven percent of gross sales from the operation of the restaurant, as that term is defined in the franchise agreement. In April 1985, defendants and TWO entered into a written modification, which deleted the original paragraph 3 entitled "Use" in its entirety and added the following language:

> Lessee agrees to continue to operate a Burger King Restaurant on the demised premises. Lessor grants Lessee the right to use the premises for any other lawful purpose, provided however, in the event that Lessee ceases to operate a Burger King Restaurant on the premises . . . or makes any other use of the premises except as a Burger King Restaurant, the monthly rental . . . shall be equal to the greater of (i) one-twelfth (1/12) of seven percent (7%) of "gross sales" for the twelve (12) months immediately preceding the initial change of use (hereinafter referred to as base rent) or (ii) seven percent (7%) of gross sales from the operation of the business on the premises. The base rent shall then be increased by five percent (5%) annually for the duration of the lease term.

This amendment also extended the term of the lease to September 30, 2005, and permitted TWO to assign its rights under the lease to any approved Burger King franchisee. One month later, in May 1985, TWO merged with plaintiff BKC. In 1984 and 1985, defendants collected over $5,000 per month in rent. In March 1990, plaintiff ceased to operate a Burger King restaurant on the premises. According to the affidavit of Ron Reis, an accountant with BKC, from April 1990 through June 1992, BKC paid defendants $4,000, whereas under the amendment the correct amount would have been $3,127.51 until April 1991, when $3,283.89 would have been correct. In June 1992, rental payments were increased five percent to $4,200, whereas under the amendment, the rent would have changed to $3,448.08. In July 1993, the rent paid increased five percent to $4,410, while under

the amendment it should have been $3,620.49 until April 1994, when $3,801.51 would be correct. Starting in August 1994, BKC paid monthly rent of $4,630.50 through February 1995, when this litigation commenced. The alleged overpayments total $39,772.29.

After discovery, the trial court denied defendants' motion for summary judgment and, in a non-final order, granted BKC's motion for declaratory judgment, effectively construing the rental term of the lease as amended. In so construing the amendment, the trial court refused to reform the contract to impose an overriding minimum base rent of $4,000, despite the uncontradicted affidavit testimonies of defendant Jack Yeazel and Paul Wheeler of TWO that such a monthly minimum was the true intention of the original parties to the amendment. The trial court further ruled that OCGA § 13-1-13 prevented plaintiff from recovering alleged overpayments made prior to filing the complaint under the theory that these were voluntary payments. From the final order directing defendants to reimburse plaintiff more than $15,000 ($15,715.96 with interest accruing at the rate of 12 percent per annum from the date of the judgment) in rent overpaid since the filing of the action, defendants brought this appeal.

1. The majority correctly holds the trial court erred in refusing to consider parol evidence of mutual mistake of fact authorizing reformation of the writing constituting the agreement of the original parties to the lease. The uncontradicted evidence demonstrates the intent of the original parties to the 1985 lease amendment was to include an overriding minimum base rent of $4,000 per month.

A mistake of law by the draftsman or other agent, by which the contract, as executed, does not fulfill or violates the manifest intention of the parties to the agreement may be relieved in equity. OCGA § 23-2-23; *Sheldon v. Hargrose*, 213 Ga. 672, 674 (1) (100 SE2d 898).

> In a suit for reformation of contract based upon alleged mutual mistake, the parol evidence rule does not bar introduction of testimony as to the oral agreement reached by the parties which the writing was intended to reflect. *Cotton States Life Ins. Co. v. Carter*, 65 Ga. 228[, 230] (1880); *Green v. Johnson*, 153 Ga. 738 (7) (113 SE 402) (1922).

*Ga. Farm &c. Ins. Co. v. Wall*, 242 Ga. 176, 179 (2) (249 SE2d 588). Consequently, the trial court's reasoning that parol evidence is inadmissible to reform an unambiguous contract is erroneous. The question then becomes whether refusal to reform the lease is nevertheless correct, for a judgment that is right for any reason must be affirmed. *Amwest Surety Ins. Co. v. RA-LIN & Assoc.*, 216 Ga. App. 526, 531 (1) (455 SE2d 106).

In my view, equitable relief in the form of reformation of the amended lease is precluded by the intervening equity arising from the subsequent assignment of that lease to BKC for valuable consideration, without notice of defendants' intent that the lease as amended provide a minimum monthly rent of $4,000, even in the event BKC no longer operated a Burger King restaurant on the premises. "Equity will grant relief as between the original parties or their privies in law, in fact, or in estate, except bona fide purchasers for value without notice." OCGA § 23-2-34. This rule applies to the remedy of reformation. *Volunteer &c. Ins. Co. v. Powell-White Co.*, 187 Ga. 705, 707 (2) (1 SE2d 662). The mistake of the parties to the original lease cannot be rectified to the detriment of an innocent purchaser for value without notice. *Malette v. Wright*, 120 Ga. 735, 742 (2) (48 SE 229). Accord *Spinks v. Glenn*, 67 Ga. 744, 747 (4) (1881). The trial court correctly refused to reform this lease as amended, in order to impose an overriding minimum monthly rent of $4,000.

2. The trial court ruled that recovery of any alleged overpayments plaintiff made prior to the initiation of this suit for money paid by mistake was precluded by OCGA § 13-1-13 regarding voluntary payments, but further concluded that Code section did not prevent plaintiff from claiming an offset or recoupment for any overpayments made during the pendency of the declaratory judgment action. I disagree with the majority that this ruling is error.

> Payments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property. Filing a protest at the time of payment does not change the rule prescribed in this Code section.

OCGA § 13-1-13. Defendants argue that BKC cannot prove it was legitimately unaware of the true facts and further argue the trial court ignored the payment under protest portion of the rule.

In my view, BKC did not have all the material facts at any time it made a payment during the pendency of the action,[31] because the construction of the amendment was in doubt until the trial court's initial ruling. Consequently, the so-called voluntary payment doctrine was certainly inapplicable once plaintiff sought declaratory judgment or construction of the contract. "If [payment] was made in

---

[31] Defendants concede BKC continued to make rent payments to them.

ignorance of the law, recovery is barred; if in mistake of law, recovery is permitted. [Cits.]" *American Surety Co. v. Groover*, 64 Ga. App. 865, 870 (14 SE2d 149) (on rehearing). Where one acts under a mistake of what the applicable law was to the state of facts, or was requiring of it, this mistake, though a product of ignorance, would be such a mistake of law as would come within the rule authorizing recovery or reallocation of payments. *Emond v. State Farm &c. Ins. Co.*, 175 Ga. App. 548, 550 (2) (333 SE2d 656). A determination of the rights of the parties to a lease is a proper subject for declaratory relief under OCGA § 9-4-1 et seq. *Cook Farms v. Bostwick*, 165 Ga. App. 692, 693 (1) (302 SE2d 574). The trial court correctly determined that alleged overpayments in monthly rent made during the pendency of a declaratory judgment action to construe the amended lease and determine the correct amounts owed thereunder were not barred from recovery or reallocation under OCGA § 13-1-13 and the voluntary payment doctrine. Because the majority declines to recognize the applicable rule, I respectfully dissent from the judgment of reversal.

I am authorized to state that Judge Eldridge joins in this dissent.

DECIDED NOVEMBER 23, 1999 — 

*Craig M. Frankel*, for appellants.
*Eastman & Apolinsky, Stephen D. Apolinsky*, for appellee.