**In re SGE MORTGAGE FUNDING CORP., Debtor.**

**SGE Mortgage Funding Corp., Plaintiff,**

v.

**Accent Mortgage Services, Inc., et al., Defendants.**

**Bankruptcy No. 99–71191.**
**Adversary No. 01–7047.**

United States Bankruptcy Court,
M.D. Georgia,
Valdosta Division.

Aug. 7, 2003.

John Flanders Kennedy, Hall, Bloch, Garland and Meyer, Macon, GA, for Debtor.

Mary Grace Diehl, Thomas Paty Stamps, Atlanta, GA, for Petitioning Creditor.

Ward Stone, Jr., Stone & Baxter, LLP, Macon, GA, for Debtor/Plaintiff.

Brian M. Deutsch, Atlanta, GA, for Plaintiff.

Richard Farnsworth, Tucker, GA, John L. Strauss, Covington, GA, for Defendant.

James C. Frenzel, Atlanta, GA, for Intervenor–Plaintiff.

Ray S. Smith, III, Tucker, GA, for Defendant/Counter–Claimant/Cross–Defendant/Third Party Plaintiff.

Andrew J. Ekonomou, Boyce, Ekonomou & Atkinson, Atlanta, GA, for Plaintiff/Counter–Defendant.

Daniel W. Mitnick, Mitnick & Associates, Alpharetta, GA, for Cross–Defendant.

A. Todd Merolla, Robert T. Thompson, Jr., Atlanta, GA, for Third Party Defendant.

## MEMORANDUM OPINION

JOHN T. LANEY, III, Bankruptcy Judge.

On June 12, 2003, the Court held the second day of a two-day hearing on cross-motions to enforce the settlement agreement between SGE Mortgage Funding Corp. ("SGE") and Accent Mortgage Services, Inc. ("Accent"). At the conclusion of the hearing, the Court took the cross-motions under advisement. The Court has considered the evidence, the parties' briefs, proposed findings of fact and conclusions of law, and oral arguments, and the applicable statutory and case law. For reasons that follow, the Court will grant SGE's Motion to Enforce Settlement Agreement.

### BACKGROUND

Pre-petition, SGE was a residential mortgage broker licensed in Georgia. A large portion of SGE's business involved SGE's solicitation and origination of loans to potential borrowers desiring to obtain loans secured by real estate. SGE funded its mortgage loan origination business through cash investments made by "investors." Each investor would loan SGE money. SGE would utilize these funds in its lending business to individual borrowers. In return for the investors' loan, SGE would pay the investor a monthly amount based on a designated interest rate.

However, SGE had been engaged in a classic Ponzi scheme. Upon closing a mortgage loan to an individual borrower, SGE would "assign" that loan not only to one investor but to numerous investors. Like many Ponzi schemes, SGE used funds obtained from later investors to pay the monthly principal and interest payments due to the earlier investors. Accent got involved in the fraudulent scheme when it allegedly purchased some of the loans which SGE had "double-booked."

On September 27, 1999, an involuntary petition under Chapter 7 of the Bankruptcy Code ("Code") was commenced against SGE. On December 10, 1999, this case was converted to a Chapter 11 case. The attorney who had been appointed as Receiver by the Superior Court of Tift County was named Responsible Person to oversee the SGE bankruptcy estate. On June 25, 2000, SGE filed Adversary Proceeding No. 00–7013 ("A.P. No. 00–7013") to determine the extent, validity, and priority of liens and security interests between SGE and the named defendants. On September 28, 2001, SGE filed Adversary Proceeding No. 01–7047 ("A.P. No. 01–7047") for recovery of property from the named defendants under 11 U.S.C. § 542. Accent was among the named defendants in both adversary proceedings. SGE's allegations against Accent in A.P. No. 01–7047 included claims for conversion, fraud, state and Federal RICO violations, fraudulent conveyance under the Code, and breach of contract. SGE's claims against Accent were centered around SGE's main allegation that Accent never paid SGE for loans purportedly transferred to Accent prior to the SGE bankruptcy. On July 22, 2002, the Court approved the consolidation of all Accent/SGE claims and actions into A.P. No. 01–7047.

SGE and Accent entered into a settlement agreement ("Settlement Agreement") to settle the dispute between the two parties regarding the transaction that occurred pre-bankruptcy involving a purported sale of 93 loans from SGE to Ac-

cent ("Original Loans"). (*See* SGE–1, pg. 1). Under the Settlement Agreement, SGE agreed to sell its rights in a portfolio of loans ("Loan Pool"), consisting of 49 loans listed in Exhibit B of the Settlement Agreement, without recourse or warranties of any kind, to Accent for a sum of money. (*See* SGE–1, ¶ # 1, & Ex. B). The Settlement Agreement contemplated the sale of the Loan Pool to Real Estate Masterminds, LLC ("REMM"). (*See* SGE–1, ¶ # 2). However, REMM was not a party to the Settlement Agreement. (*See* SGE–1, pg. 4). Nor was SGE a party to the REMM/Accent agreement. Ultimately, only a portion of the loans listed in Exhibit B of the Settlement Agreement were sold to REMM. After it became clear to SGE that Accent either wanted additional loans to sell or it would not pay the remaining balance from the Settlement Agreement, SGE filed a Motion to Enforce Settlement Agreement. On May 1, 2003, shortly before the first day of the hearings, Accent filed a Cross–Motion to Enforce Settlement Agreement.

SGE contends that neither party was sure of SGE's interest in the loans described in the Settlement Agreement. Further, SGE alleges that Accent was fully aware of the poor status of all of the loans before it entered into the Settlement Agreement. Thus, SGE transferred the Loan Pool to Accent without recourse or warranties of any kind. (*See* SGE–1, ¶ # 1). Further, SGE urges that Accent is misconstruing the plain language of Paragraph # 12 of the Settlement Agreement because it does not warrant the status of the loans. (*See* SGE–1, ¶ # 12).

SGE contends that the only loans ever available to Accent were the Original Loans allegedly involved in the SGE/Accent transaction prior to the filing of SGE's bankruptcy petition. (*See* SGE–1, pg. 1, & Ex. A). SGE agrees that some loans from the Loan Pool were substituted with other Original Loans. However, SGE alleges the substitutions occurred prior to the Settlement Agreement being approved by the Court. SGE concedes that discussions may have occurred between SGE's litigation counsel and Accent's counsel regarding substitution loans after the Settlement Agreement was approved by the Court. However, no agreement was reached and approval from the Court was not obtained. Therefore, there was no mutual departure from the Settlement Agreement which would be enforceable against SGE.

SGE maintains that Accent was able to hand pick from the Original Loans which loans it wanted to sell to REMM. SGE argues that Accent cannot now claim that it has fully satisfied its duties under the Settlement Agreement, particularly in light of the supplemental agreement ("Amendment") entered into on December 30, 2002 prior to a closing with REMM. (*See* SGE–2). Nor can Accent claim that SGE owes Accent additional non-Original Loans to fully satisfy SGE's obligations under the Settlement Agreement. Finally, SGE contends that it agreed to advance Accent the money for the ad valorem taxes due at the December closing and Accent was to reimburse SGE.

Accent contends that it is excused from further performance under a number of theories. Accent argues first that there was a mutual mistake as to SGE's rights in the loans contemplated by the Settlement Agreement. Accent contends that both parties believed that SGE had existing rights in the loans it planned to sell to Accent. Accent urges that both parties were mistaken because, once the loans were prepared for the sale to REMM, it was discovered that SGE had no rights in some of the loans contemplated in the Settlement Agreement. Regardless of SGE's knowledge of its rights in the loans

or the lack thereof, Accent argues next that SGE breached the Settlement Agreement. Accent reads Paragraph # 12 of the Settlement Agreement to warrant that SGE had rights in and had "not sold, assigned, transferred, conveyed or otherwise disposed of" any of the loans referred to in the Settlement Agreement. (*See* SGE–1, ¶ # 12). If the Court does not find a breach of the Settlement Agreement on those grounds, Accent argues that it is excused from further performance because the Settlement Agreement was conditioned on the Loan Pool sale to REMM. (*See* SGE–1, ¶¶ # 1, # 2). Accent urges that the Loan Pool sale contemplated in the Settlement Agreement never occurred.

If the Court finds that the Loan Pool sale to REMM was not a condition precedent, Accent argues that both parties operated under a mutual departure from the terms of the Settlement Agreement. Accent alleges that when one of the original 49 loans was found to be unavailable for sale, SGE's litigation counsel would allow Accent to choose another loan to be reviewed to determine whether it was available for sale. Accent claims that non-Original Loans were contemplated as substitutions by both parties to fulfill SGE's obligation to transfer 49 loans to Accent. (*See* Def.–19). Accent argues first that it should be excused from further performance because Accent has paid for all of the loans that SGE did transfer. In the alternative, Accent argues that SGE should be required to transfer non-Original Loans to fulfill its obligation to transfer a total of 49 loans to Accent. Finally, Accent contends that SGE agreed to pay for the ad valorem taxes due at the December closing, without promise of reimbursement from Accent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Along with the two above named adversary proceedings, Accent was involved in other pending litigation regarding its mortgage brokerage practices. In an attempt to settle all outstanding litigation, Betty Sullivan, Accent's Chief Executive Officer ("C.E.O."), and her attorney, John McManus, became involved in a plan to purchase the Loan Pool from SGE. Accent would in turn sell the Loan Pool to REMM to fund the settlement with SGE, as well as allow Accent to settle other outstanding litigation. During settlement negotiations, an agreement was reached and reduced to writing in the form of the Settlement Agreement. The Settlement Agreement was approved by the Court on September 17, 2002. The execution of the Settlement Agreement contemplated the sale of the Loan Pool to REMM. However, REMM was not a party to the Settlement Agreement, nor was SGE a party to the REMM/Accent agreement.

Accent encountered many problems getting a pool of loans into good enough condition to sell to REMM. As loans were prepared for sale, Accent and/or SGE discovered that some of the loans had been sold by SGE or were otherwise unavailable for sale. As problems with particular loans were discovered, SGE's litigation counsel and Accent's counsel conferred on replacing some loans on an initial list with substitute loans. Eventually, the list of 49 loans in Exhibit B of the Settlement Agreement was compiled. Both parties conceded that substitution discussions took place after the Court approved the Settlement Agreement. However, those substitutions were not approved by the Court.

Multiple attempts to close the REMM Loan Pool sale were made during the fall of 2002 through early 2003. Some of the delay was caused when REMM's financing was not lined up. However, most of the delay was caused by problems incurred in

getting the necessary documentation prepared for the closings. Ultimately, only 37 loans were available to Accent to sell to REMM. Two separate closings occurred. The first was on December 30, 2002. The second occurred in late March 2003.

During the closing on December 30, 2002, when 24 loans were sold to REMM, SGE and Accent entered into a supplemental agreement ("Amendment"), which clarified the parties' duties to each other. The Amendment was not approved by the Court because SGE felt that it did not materially alter the court-approved Settlement Agreement. Accent now claims that Ms. Sullivan and Mr. McManus felt like they had no choice but to sign the Amendment.

■ When substantive state law claims are pursued via adversary proceedings in bankruptcy, the substantive law of that state is controlling. *See generally Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, in the instant case Georgia law is controlling. In Georgia, settlement agreements are controlled by contract law. *See Flagg Energy Develop. Corp. v. General Motors Corp.,* 223 Ga.App. 259, 260, 477 S.E.2d 402, 404 (1996). According to the Official Code of Georgia ("Georgia Code"), "The construction of a contract is a question of law for the court." O.C.G.A. § 13–2–1 (1982 & Supp.2002). Further, the question whether a contract term is ambiguous is also a question of law. *See Archer v. Carson,* 213 Ga.App. 161, 163, 444 S.E.2d 82, 84 (1994). If a contract term is unambiguous, then extrinsic evidence will not be allowed. *See* O.C.G.A. § 13–2–2(1) (1982 & Supp.2002). If a term is found to be ambiguous, the ambiguity does not become a question of fact unless it cannot be solved by applying the rules of contract construction under O.C.G.A. § 13–2–2. *See Archer,* 213 Ga.App. at 163, 444 S.E.2d

at 84; *see also* O.C.G.A. § 13–2–2 (1982 & Supp.2002). In construing contracts, words are to be given their "usual and common" meaning. O.C.G.A. § 13–2–2(2) (1982 & Supp.2002). Finally, the goal when construing a contract is to ascertain the intent of the parties. *See Hull v. Lewis,* 180 Ga. 721, 180 S.E. 599, 601 (1935). In doing so, the Court must consider the contract as a whole. *See id.* at 721, 180 S.E. at 601. Circumstances surrounding the Settlement Agreement can be considered to ascertain the parties' intent but cannot be used to change the terms of the contract in any way. *See R.C. Craig, Ltd. v. Ships of Sea, Inc.,* 401 F.Supp. 1051, 1058 (S.D.Ga.1975).

■ Here, the dispute hinges on three sections of the Settlement Agreement, Paragraph # 1, Paragraph # 2, and Paragraph # 12. Paragraph # 1 of the Settlement Agreement states:

> "SGE shall sell to [Accent] and [Accent] shall purchase those loans listed in the pool of loans set forth in Exhibit 'B' attached hereto and incorporated herein by reference in accordance with 11 U.S.C. § 363, free and clear of liens (hereinafter 'Loan Pool'). Said transfer from SGE to [Accent] shall be made **WITHOUT RECOURSE OR WARRANTIES OF ANY KIND,** subject to the closing of the Loan Pool Sale."

*(See* SGE–1, ¶ # 1).

Paragraph # 2 of the Settlement Agreement states:

> "Thereafter, [Accent] shall sell to Real Estate Masterminds, LLC, a Georgia limited liability company (hereinafter 'REMM'), the Loan Pool for the sum of One Million Dollars and zero cents ($1,000,000.00) in accordance with the Purchase Agreement executed contemporaneously herewith and incorporated herein by reference, **WITHOUT RE-**

COURSE OR WARRANTIES OF ANY KIND."

(*See* SGE–1, ¶ # 2).

Paragraph # 12 of the Settlement Agreement states:

"The Parties represent and warrant that they have the sole right and exclusive authority to execute this Agreement; that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any of [sic] claims, demands, obligations, or causes of action referred to in this Agreement; and that they have the legal capacity to enter into this Agreement."

(*See* SGE–1, ¶ # 12).

The language in Paragraph # 1 is clear that SGE will sell and Accent will purchase the Loan Pool, made up of 49 loans in Exhibit B of the Settlement Agreement. According to Black's Law Dictionary, sell means "To dispose of by sale (q.v.). To transfer title or possession of property to another in exchange for valuable consideration." BLACK'S LAW DICTIONARY 1360 (6th Ed.1990). This particular sale, because of SGE's bankruptcy case, is pursuant to 11 U.S.C. § 363 and Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019"). 11 U.S.C. § 363 (1993 & Supp.2002); FED. R. BANKR. P. 9019. Both require notice, an opportunity to be heard, and court approval. Further, the "sale" definition is somewhat troublesome because SGE did not have an interest in all of the loans in the Loan Pool. As it turned out, SGE lacked interest in twelve of the loans.

However, two factors save the contract term "SGE shall sell. . . ." First, the contract language **"WITHOUT RECOURSE OR WARRANTIES OF ANY KIND"** makes it clear that SGE did not promise that it had rights in the loans. Additionally, Accent had no recourse when it was later found that SGE lacked rights in some of the loans. It is clear on the face of the Settlement Agreement that the sale was "caveat emptor," let the buyer beware. BLACK'S LAW DICTIONARY 222 (6th Ed.1990).

Second, the parties' knowledge of SGE's interests in the Original Loans, or lack thereof, is relevant because the circumstances surrounding the Settlement Agreement can be considered to best discern the parties' intent. Evidence presented at the hearings established that SGE's Responsible Person John Flanders Kennedy and his legal counsel were unaware of exactly what SGE's interests were in the Original Loans due to the nature of the pyramid scheme that the former SGE principals had been engaged in. While some of the Original Loans had been paid off to SGE and that money was being held in an escrow account during the pendency of this adversary proceeding, other loans were unaccounted for, had documentation missing, and funds were not being received by SGE. Simply put, SGE did not know what it had.

As testified to by Mr. Kennedy and Brian Deutsch, an associate working with SGE's litigation counsel, the words **"WITHOUT RECOURSE OR WARRANTIES OF ANY KIND"** were placed in the Settlement Agreement to make it clear that SGE was transferring what ever rights it had, if any, in the Loan Pool to Accent. This phrase was not hidden in the fine print, in fact the phrase was bold face and typed in all capital letters. Testimony from Mr. Kennedy also proved that the parties working on behalf of SGE were unaware of any alleged mistake made by Accent regarding the status of SGE's rights in the Loan Pool. The Court is persuaded to believe SGE had made it clear to Accent that SGE's rights in the Loan Pool were uncertain.

As to Accent's knowledge, Betty Sullivan, Accent's current Chief Executive Offi-

cer ("C.E.O."), purchased Accent in May 2002 retroactive to September 2001. Ms. Sullivan testified that she purchased Accent because it was a business platform and was licenced to do business in 25 states. Ms. Sullivan had previously been the Chief Operating Officer ("C.O.O.") for Lahaina Acquisitions, Accent's parent company, since 1999. Ms. Sullivan conceded she knew about the pending litigation at the time she acquired Accent. However, despite her knowledge that the loans were in poor condition, Ms. Sullivan contends that she, nor any agent of Accent, knew that SGE might not have rights in some of the loans.

If Ms. Sullivan did not know this possibility existed, then she should have. According to her own testimony, Ms. Sullivan knew Lahaina had written the value of the Original Loans down to zero as an asset on its accounting books. Ms. Sullivan stated this was because Lahaina could not assign a dollar value to the Original Loans because of the pending litigation. Ms. Sullivan testified she was under the impression prior to her purchase of Accent that the Original Loans had a value of approximately $1.8 million. Despite her testimony, given Ms. Sullivan's position with Lahaina and her knowledge of SGE and Accent's past history, she should have known that SGE might not have rights in all of the Original Loans.

Even if Ms. Sullivan was not aware of the fact SGE might not have rights in some of the Original Loans, excusable or not, she was given plenty of opportunities to do due diligence before her purchase of Accent. Ms. Sullivan testified that an Accent representative inspected eighteen of the properties, prior to her purchase. The representative reported back that SGE no longer had an interest in some of the notes on the underlying properties. While a non-insider buyer may not have been privy

to this information, Ms. Sullivan was C.O.O. of Lahaina, Accent's parent company and certainly had access to the representative's findings. Ms. Sullivan also testified that she went to Macon to visit with Mr. Kennedy to discuss the loan portfolio to establish a value for the asset prior to purchasing Accent.

Prior to signing the Settlement Agreement, Mr. Kennedy's office supplied Accent with approximate balances on each loan. Accent then calculated its own valuation of the Original Loans by taking the outstanding balance and adding interest and penalties per each financing contract. Accent created its own amortization table for each loan. Accent came up with the value of $2.5 million for the Original Loans. However, according to Ms. Sullivan's testimony, this is less than what Accent purportedly paid originally in the pre-petition transaction with SGE involving the same loans. Ms. Sullivan and Accent had additional opportunities to do due diligence prior to signing the Settlement Agreement with SGE. Accent sent demand letters to each of the 49 properties in the Loan Pool prior to signing the Settlement Agreement. Further, Accent had ample time to complete title searches on the property. Each of these opportunities gave Ms. Sullivan and Accent plenty of access to information to effectively evaluate both Ms. Sullivan's purchase of Accent and Accent's decision to enter into the Settlement Agreement with SGE. Thus, the language **"WITHOUT RECOURSE OR WARRANTIES OF ANY KIND,"** coupled with the parties' knowledge, established that Accent knew or should have known what it had bargained for.

However, two other aspects of Paragraph # 1 could be troublesome. First, the Settlement Agreement contemplated two Loan Pool sales: 1) SGE to Accent; 2) Accent to REMM. Under *Hull*, the Court

must consider the Settlement Agreement as a whole. *Hull,* 180 Ga. at 721, 180 S.E. at 601. According to both parties, it was well known that Accent could not fund the Settlement Agreement without the sale of the Loan Pool to REMM. Therefore, it is clear that the intent was for the phrase "...the Loan Pool Sale" in Paragraph # 1 to refer to the Loan Pool sale to REMM in Paragraph # 2.

■ Second, according to the court in *Blue Ridge Apartment Co., Inc. v. Telfair Stockton & Co., Inc.,* 205 Ga. 552, 54 S.E.2d 608 (1949), the phrase "subject to" creates a condition precedent. *Blue Ridge Apartment, Co., Inc.,* 205 Ga. at 558–559, 54 S.E.2d at 612–613. However, in this matter, the condition precedent was waived after the parties signed the Amendment on December 30, 2002. (*See* SGE–2). The Amendment clearly states that under the Settlement Agreement "[Accent] became obligated to pay SGE the sum of $738,778.00 (the 'Settlement Sum'), in cash, in full and final settlement and compromise of all claims between the parties." (*Id.*).

■ Accent presented evidence that Ms. Sullivan and Mr. McManus were pressured into signing the Amendment or risk losing REMM as its source of financing for the Settlement Agreement because of further delay. However, under Georgia law, when a person is considered to be "sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract." *Cooperative Resource Ctr., Inc. v. Southeast Rural Assistance Project, Inc.,* 256 Ga.App. 719, 721, 569 S.E.2d 545, 547 (2002), *cert. denied,* October 15, 2002. Here, there was ample evidence which established that Ms. Sullivan is a sophisticated business person. As stated above, Ms. Sullivan was the C.O.O. of Lahaina for approximately two years prior to

her purchase of Accent. Prior to her time with Lahaina and Accent, Ms. Sullivan worked for Malibu Entertainment Worldwide. Ms. Sullivan also testified that she had twelve years of experience in the mortgage financing industry working for conventional type banks involved in secured and unsecured installment lending. Additionally, Ms. Sullivan worked one year with Home Federal Savings and Loan Association. Further, Ms. Sullivan and Mr. McManus both testified that Mr. McManus was present on a conference call with Ms. Sullivan when Accent agreed to the Amendment.

■ The Court is not persuaded by Accent's argument that Paragraph # 12 of the Settlement Agreement somehow warranted that SGE had rights in all of the loans contemplated by the Settlement Agreement. Such an interpretation is contrary to the clear language in Paragraph # 1 of the Settlement Agreement. Paragraph # 12 relates to the parties' authority to enter into the Settlement Agreement and the warranties by each party that they had not sold, assigned, or otherwise disposed of any claims that the parties had against each other in A.P. No. 01–7047. To read this warranty provision of the Settlement Agreement to include a warranty as to SGE's rights in the loans is a stretch the Court is unwilling to make.

■ The Court is not persuaded by Accent's argument that there was a mutual mistake or a mutual departure. For there to be a mutual mistake, "...both parties must have labored under the same misconception in respect to the terms and conditions of the written instrument...." *Yeazel v. Burger King Corp.,* 241 Ga.App. 90, 94, 526 S.E.2d 112, 116–117 (1999). Here, the evidence is clear there could not have been a mutual mistake as to SGE's interests, or lack thereof, in the Loan Pool.

Even if there was a unilateral mistake on Accent's behalf, under Georgia law, it would not excuse Accent from performance under the contract. *See Malin v. Servisco, Inc.,* 172 Ga.App. 418, 323 S.E.2d 278, 279 (1984). For there to be a mutual departure, both parties must consent to the departure. *See Eaves v. J.C. Bradford & Co., Inc.,* 173 Ga.App. 470, 471–472, 326 S.E.2d 830, 832 (1985). Further, a departure from the terms of the Settlement Agreement would have required approval from this Court. *See generally* FED. R. BANKR. P. 9019.

■ There was some argument whether the Amendment needed court approval. The parties agree and the record shows that the Amendment was never submitted to the Court for approval. However, only those changes that would be considered detrimental to the interests of the estate and the creditors, as a whole, would create a need for court approval. *See generally* FED. R. BANKR. P. 9019; *In re A & C Properties,* 784 F.2d 1377, 1382 (9th Cir. 1986). Rule 9019 requires that all compromises regarding property of the estate be approved by the Court after notice and an opportunity to be heard. *See* FED. R. BANKR. P. 9019. The Court approved the Settlement Agreement because it was in the best interests of the estate and its creditors. In reviewing the Amendment, it does not materially change the obligations of SGE from the Settlement Agreement. In fact, it enhances the interests of the estate and the creditors, as a whole, because it entitles SGE to full payment of the amount agreed to in the Settlement Agreement, without the contingency of the Loan Pool sale to REMM. Therefore, court approval of the Amendment was not necessary.

Further, the Amendment confirms that the parties had not made a mistake or departed from the terms of Settlement Agreement. Other than the waiver of the REMM Loan Pool closing as a condition precedent to Accent's performance, nothing changed. As stated above, this waiver was not material and did not need to be approved by the Court. By December 30, 2002, when the Amendment was signed, Accent was fully aware of SGE's lack of interest in some of the loans. Despite this knowledge, Accent confirmed its obligation to pay the full amount under the Settlement Agreement when Ms. Sullivan and Mr. McManus signed the Amendment.

Finally, the parties appear to be in agreement as to the amounts already paid by Accent to SGE. According the Settlement Agreement, a total of $738,778.00 was to be paid by Accent to SGE to settle the outstanding claims. SGE has held $231,178.00, plus accrued interest, in escrow. This amount represents funds received by SGE from loans associated with Accent and is to be credited towards the amount due from Accent. On November 30, 2002, Accent paid SGE $50,000.00, as an extension fee to have the closing date postponed until a time in December. This amount is also to be credited towards the amount due from Accent. On December 30, 2002, SGE received $176,866.31 from Accent after a closing with REMM. On or about March 31, 2003, SGE received an additional $59,283.45 from Accent after an additional closing. The remaining balance due to SGE from Accent on the Settlement Agreement is $221,450.24.

As to the ad valorem taxes, from the December closing with REMM, the Amendment specifically states in Paragraph 3(d) "AMSI shall, on or before, January 31, 2003, meet with SGE to negotiate in good faith the payment of the remaining $280,733.69 *(together with amounts paid by SGE for ad valorem taxes, as required under the subparagraph (c), above) which is hereby expressly acknowledged to be*

*due and unpaid to SGE....*" (SGE–2, ¶ 3(d), pg. 2)(emphasis added). The Amendment makes it clear that Accent was to reimburse SGE for the ad valorem taxes. Ms. Sullivan even testified to the fact that the Amendment expressly states Accent is responsible for the ad valorem taxes. While Accent presented evidence that Ms. Sullivan and Mr. McManus felt pressured into signing the Amendment or lose REMM as the source of the funds to pay Accent's settlements, as discussed above, such pressure does not allow for contract rescission under Georgia law. *See Cooperative Resource Ctr., Inc.,* 256 Ga.App. at 721, 569 S.E.2d at 547.

For the reasons stated above, the Court will grant SGE's Motion to Enforce Settlement Agreement. Under the Settlement Agreement and the Amendment, Accent owes SGE $221,450.24, plus the amount of ad valorem taxes paid by SGE. SGE alleges that the ad valorem taxes were $24,494.86. However, the Court has not been able to find either an admission of that amount by Accent or evidence as to that amount in the record. If Accent disputes this amount, it will have 10 days to file a Motion to Reconsider. A prayer for interest, attorneys fees, and costs was made by SGE. However, SGE did not provide any evidence or legal argument as a basis for awarding them at this time. Therefore, none will be awarded. An order in accordance with this Memorandum Opinion will be entered.